UNITED STATES of America for the Use of WESTINGHOUSE ELECTRIC CORPORATION, Plaintiff,

v.

MARIETTA MANUFACTURING COMPANY and The Travelers Indemnity Company, Defendants.

Civ. A. No. 2228.

United States District Court, S. D. West Virginia, Huntington Division.

Feb. 22, 1972.

W. C. Price, Jr., Payne, Minor, Ray, Price & Loeb, Charleston, W. Va., for plaintiff.

Robert H. C. Kay, Kay, Casto & Chaney, Charleston, W. Va., for Marietta Mfg. Co.

James K. Brown, Jackson, Kelly, Holt & O'Farrell, Charleston, W. Va., for Travelers Indemnity Co.

CHRISTIE, District Judge:

The use plaintiff, Westinghouse Electric Corporation (Westinghouse), insti-

tuted this Miller Act suit, 40 U.S.C. § 270b, against Marietta Manufacturing Company (Marietta) and its surety, The Travelers Indemnity Company (Travelers), seeking judgment for $39,006.80, claimed to be the balance owing it by Marietta for machinery and equipment furnished. The machinery and equipment were used by Marietta in the construction of two oceanographic research ships it had contracted to build for the Department of the Navy. In its answer to the complaint, Marietta denied that it owed Westinghouse the amount claimed, asserting that the machinery, equipment and materials furnished by Westinghouse failed to meet applicable specifications of the various contracts involved, that Marietta was required to incur expenses in order to make the equipment functional and that delivery thereof was made after the times required by the contract. In addition to its denial of liability, Marietta reasserts in a counterclaim that the electrical and mechanical equipment furnished by Westinghouse was not delivered to it in good mechanical and workable condition and did not meet applicable contractual specifications. As a consequence, Marietta allegedly was required to expend a total of $191,949.85 in order to correct such deficiencies. Based upon these expenditures, Marietta demands judgment against Westinghouse in the sum of $191,949.85 "plus any amounts which might be disclosed by subsequent investigation and discovery."

The case is presently before the Court on motion of Westinghouse for partial summary judgment pursuant to the provisions of Rule 56 of the Federal Rules of Civil Procedure. Westinghouse alleges that, as to certain items of damage contained in Marietta's counterclaim, there is no genuine issue as to any material fact and that Westinghouse, therefore, is entitled to judgment as a matter of law.

### FACTUAL BACKGROUND

Viewing the facts in the light most favorable to Marietta, as required on motion for summary judgment, the rele-

vant facts involved may be summarized as follows:

In December of 1961, Marietta entered into a contract with the Department of the Navy whereby Marietta agreed, for a stated consideration, to construct two oceanographic research ships, designated AGOR #6 and AGOR #7. Pursuant to the requirements of the Miller Act, Marietta furnished a payment bond to the United States, with Travelers as surety, in the amount of $2,721,052.

Subsequent to entering into the contract for construction of the two ships, Marietta received a proposal from Westinghouse whereby the latter agreed to furnish certain electrical propulsion and auxiliary equipment for the two ships at a cost of $300,000 per ship. In February of 1962, Marietta accepted the offer, however, in March of the same year, Marietta cancelled its previous acceptance, requesting Westinghouse to forward cancellation charges or, in the alternative, an offer with respect to the same equipment at a reduced price. The parties then agreed on an order from Westinghouse covering this same equipment at a total price of $515,000. On March 20, 1962, Westinghouse, by letter, confirmed this agreement, stating that electrical equipment would be supplied "as outlined in our proposal dated 8 November 1961 and detailed in our quotation letter of 15 November 1961, for two (2) ships designated AGOR 6 and 7." According to this letter, the equipment to be supplied was to meet the Specifications for Building Oceanographic Research Ship AGOR–3 Class as written by the Department of the Navy Bureau of Ships, and as "interpreted and supplemented by our proposal dated 8 November 1961." By a document entitled "Purchase Order," dated September 20, 1962, Marietta confirmed its agreement to purchase the equipment contained in Purchase Order AG–2900 from Westinghouse at the reduced price of $515,000.

Westinghouse, on the back of its letter dated March 20, 1962, in which it confirmed its agreement to supply the equip-

ment at a total price of $515,000 set forth the following "Warranty":

"Westinghouse, in connection with apparatus sold hereunder, agrees to correct any defect or defects in workmanship or material which may develop under proper or normal use during the period of one year from the date of shipment, by repair or by replacement f. o. b. factory of the defective part or parts and such correction shall constitute a fulfillment of all Westinghouse liabilities in respect to said apparatus, unless otherwise stated hereunder. Westinghouse shall not be liable for consequential damages."

The purchase order from Marietta, dated September 20, 1962, contained the following "Guarantees":

"(a) If at any time within six months after the delivery of the vessel or such longer period as may be required by the Plans and Specifications, or as to an item of material installed in the vessel if at any time within the longer period agreed to by the Vendor, any weakness, deficiency, defect, failure, breaking down, or deterioration in the workmanship or material furnished by the Vendor in performing the contract work (herein called 'defective workmanship' or 'defective material'), other than that due to ordinary wear or tear where such weakness, deficiency, defect, failure, breaking down or deterioration is due solely to the negligence or other improper act of the Buyer or any operator of the vessel during said six month period, shall appear or be discovered, such defective workmanship or defective material shall, at the Vendor's expense, be made good to the satisfaction of the Buyer. The liability of the Vendor to the Buyer hereunder on account of such defective workmanship or defective material shall not extend beyond the actual repair or replacement thereof. The Vendor shall not be liable to the Buyer for any

damage to the vessel or its equipment or cargo or other property of the Buyer or for consequential damages of the Buyer arising out of such defective workmanship or defective material, except that in the event that any defective workmanship or defective material in any item of machinery or equipment furnished by the Vendor or any defective workmanship or defective material furnished by the Vendor in the performance of work on any of the vessel's machinery or equipment, causes any damage to such item of machinery or equipment the Vendor shall be liable not only for the cost of correcting or repairing such defective workmanship or defective material, but also shall be liable for the costs of correcting or repairing any damage to such item of machinery or equipment caused by such defect."

The items of damage for which Marietta seeks to recover, and to which the motion of Westinghouse is directed, fall generally, with some exceptions to be noted hereafter, into three broad types or classifications. Initially, Marietta seeks recovery of the expenses incurred by it in removing and subsequently reinstalling defective machinery. Included in this category are the claims set forth in paragraphs numbered 2, 3, 4, 8, 11 and 13, and parts of 7 and 10.[1] Secondly, Marietta seeks recovery of expenses incurred by it in testing operations conducted after the repair and installation of defective machinery. Included in this category are the claims as set forth in paragraphs numbered 5, 14, 15 and 16. Finally, Marietta seeks recovery of expenses incurred by it as a result of delay in the initial delivery of equipment and in delay resulting from breakdown of equipment previously delivered and installed. Included in this category are the claims set forth in the counterclaim in paragraphs numbered 9, 12, 17, 18, 20 and 26, and parts of 7, 8, 10 and 13.

It is the position of Westinghouse that the language contained in the warranty

---

1. See Amended and Supplemental Counterclaim of Marietta set forth in the Appendix hereto attached.

set forth in its letter to Marietta, dated March 20, 1962, and in the guaranty clause contained in the "Purchase Order" from Marietta, dated September 20, 1962, expressly releasing Westinghouse from any liability for "consequential damages," has the effect of absolving it from responsibility for the damages claimed by Marietta in its counterclaim. Marietta asserts that the damages involved in its counterclaim are not consequential damages and, therefore, are recoverable under the provisions of either the warranty clause or the guaranty clause. Additionally, Marietta asserts that the warranty clause contained in the letter of Westinghouse, dated March 20, 1962, was superseded by the provisions of its purchase order, dated September 20, 1962, and that the provisions of such purchase order did not limit the recovery to direct, as opposed to consequential, damages, at least as to the period of time prior to delivery of the two ships to the Department of the Navy. Therefore, the issues presented to the Court in deciding plaintiff's motion for partial summary judgment are whether the contract between the parties released Westinghouse from any responsibility for consequential damages resulting from its alleged breach of the contract, and, if so, whether the damages claimed by Marietta are consequential damages and thus barred by that contract.

## APPLICABLE WARRANTY CLAUSE

Marietta argues that the provisions of its purchase order supersede the warranty provision contained in the acknowledgment form of Westinghouse and that the clause in the purchase order whereby the parties agree that Westinghouse shall be responsible for defective workmanship or defective material for the period of time within six months "after delivery of the vessel" applies only to the period of time beginning with the delivery of the vessel to the Department of the Navy. Based upon this premise, Marietta argues that the provision with respect to consequential damages found in its purchase order related only to damages arising after delivery and that damages resulting from the breach of the contract by Westinghouse occurring prior to such delivery, whether direct or consequential, are recoverable by Marietta.

The Court suspects that this view of the contract is the result of the imaginative hindsight of counsel for Marietta rather than a bona fide attempt to construe the plain language of the contract between the parties. Clearly, the language of the guaranty clause contained in Marietta's purchase order establishes the period of time beyond which Westinghouse would not be responsible for defective workmanship or defective material. This period ends six months after the delivery of the vessels by Marietta to the Department of the Navy, with the possibility of adjustments based upon the happening of certain contingencies set forth therein. However, to construe the guaranty clause to justify an interpretation that that clause took effect only on delivery of the vessels would require a distortion of the language of the contract.

■ The guaranty clause simply states that Westinghouse shall be responsible for defects which occur within six months *after delivery* of the vessels. There is no language in that clause to the effect that such guaranty period shall commence *with the delivery* of the vessels and to sustain that interpretation, the Court would be required to add terms to the contract which the parties did not see fit to incorporate at the time of their negotiations. As noted by the Court in Lewis v. Dils Motor Company, 148 W.Va. 515, 522, 135 S.E.2d 597 (1964), in interpreting a contract, it is not the Court's function to speculate "concerning what the parties meant to express or should have expressed," nor is it the right or the province of the Court to alter or amend the contract of the parties where they have expressed their intent in clear and unambiguous language. Cotiga Development Company v. United Fuel Gas Co., 147 W.Va. 484, 128 S.E.2d 626, 631 (1962). Lacking either the power or desire to add terms to

the contract negotiated by the parties, Leckie v. Bray, 91 W.Va. 456, 459, 113 S.E. 746 (1942), the Court is of the opinion that the guaranty clause in Marietta's purchase order, which also contained the limitation with respect to consequential damages, applies, not *from the date of delivery of the vessels* to the Department of the Navy, but *from and after the time of delivery of the machinery and equipment* by Westinghouse to Marietta.

The consequential damage limitation found in Marietta's purchase order is, for all practical purposes, identical with the provision concerning consequential damages inserted in the acknowledgment of Westinghouse. In view of the compatibility of these two provisions, the Court does not deem it necessary to determine which of the two controls the question of damages, since, in either event, the ultimate result would be the same. Accordingly, the Court finds that, with exceptions specifically set forth in the guaranty clause of Marietta's purchase order, Westinghouse is not liable in this action for consequential damages resulting from defective workmanship or defective material.

## DAMAGES NOT RECOVERABLE BY MARIETTA

Beginning with the case of Hadley v. Baxendale, 9 Exch. 341, 156 Eng. Reprint 141 (1854), the rule with respect to recovery of damages for breach in contract actions has been that the damages recoverable are such as generally, and according to the usual course of things, result from such breach of contract. Where special circumstances in the contract give rise to some special or unusual damage, such damage is recoverable only if the special circumstances were communicated to or known by the party committing the breach. The Court in the *Hadley* case set forth the rule in the following language:

"Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, i. e. according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it. Now, if the special circumstances under which the contract was actually made were communicated by the plaintiff to the defendant, and thus known to both parties, the damages resulting from the breach of such a contract, which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a breach of contract under these special circumstances so known and communicated. But, on the other hand, if these special circumstances were wholly unknown to the party breaking the contract, he, at the most, could only be supposed to have had in his contemplation the amount which would arise generally, and in the great multitude of cases not affected by any special circumstances from such a breach of contract."

The rule set forth in the *Hadley* case has been adopted and applied by the courts of West Virginia, the state in which the contract in this case was made and in which the work was to be performed, see American Surety Co. v. Wheeling Structural Steel Co., 114 F.2d 237 (4th Cir. 1940), and would be applicable to the present Miller Act suit between Westinghouse, a sub-contractor, and Marietta, the general contractor. United States for use and Benefit of Shields, Inc. v. Citizens and Southern National Bank of Atlanta, Georgia, 367 F.2d 473 (4th Cir. 1966); United States ex rel. Hargis v. Maryland Casualty Co., 64 F.Supp. 522 (S.D.Cal.1946).

It is clear from the facts of this case that Westinghouse was aware of "special circumstances" indicating the possibility or probability of special or unusual damages. In this case, special damages arose primarily because of the

particular use which Marietta had for the machinery and equipment furnished by Westinghouse. This use—utilization of ships designed for use by the Department of the Navy—involved the possibility of special damages not only because of the fact that a ship was involved but also because of the stringent requirements imposed by the Navy Department prior to its acceptance of the ships. The communications between Westinghouse and Marietta, including the "Purchase Order" and "Acknowledgment," demonstrate that Westinghouse was aware of these "special circumstances" and thus, in the absence of a provision to the contrary, would be responsible for any special or unusual damages resulting from its breach of the contract. The parties, however, have seen fit to limit damages by their contract and in so doing, have provided that Westinghouse shall not be responsible for "consequential damages." In view of this limitation on recovery, the issue becomes not what damages were within the contemplation of the parties at the time they entered into the contract, but rather what damages, admittedly contemplated by the parties, are nevertheless barred because they may be considered or characterized as "consequential damages." To resolve this issue, the Court must first determine the meaning of consequential damages.

The Court, in Boylston Housing Corporation v. O'Toole, 321 Mass. 538, 74 N. E.2d 288, 302–303, 172 A.L.R. 1251, (1947), was faced with the problem of determining the effect of a clause in the contract between the parties to that suit which provided that the defendant would not, in any event, "be liable for consequential damages." In the course of its opinion, the Court set forth the following criterion for determining what damages should be considered consequential damages:

"The natural interpretation of 'consequential damages' as used in the contract is that it does not refer to damages that 'flow according to common understanding as the natural and probable consequences of the breach,' that is, those arising naturally 'according to the usual course of things, from such breach of contract itself,' . . . 'usual' damages . . . sometimes referred to as 'general' damages, but that it refers to damages that 'may be presumed to have been in the contemplation of the parties at the time the contract was made' by reason of special circumstances known to the parties though such damages do not 'flow according to common understanding as the natural and probable consequences of the breach,' sometimes referred to as 'special' damages. . . .

"We think that the provision against liability for 'consequential' damages, naturally interpreted, provides against liability for damages that do not arise 'according to the usual course of things, from such breach of contract itself,' that is, against liability for 'special' damages that are the consequences of special circumstances known to the parties at the time the contract was made."

In Washington & O. D. Ry. v. Westinghouse Electric & Mfg. Co., 120 Va. 620, 89 S.E. 131, 133, 91 S.E. 646 (1916), the Supreme Court of Appeals of Virginia in accord with the language found in the *Boylston* case, described consequential damages thusly:

"Consequential damages arise when certain special facts are known to the defendant at the time of the contract which would give notice to him that a breach of contract would result in an otherwise unexpected loss. If the special circumstances are communicated to the defendant, the damages resulting from the breach of such contract might reasonably be presumed to be contemplated by the parties, and may be recovered by the plaintiff, unless there is an agreement between the parties with reference to the damages."

Applying these principles to the facts of this case, it seems apparent that

the damages claimed by Marietta for expenses incurred by it in conducting testing operations after the repair and reinstallation of defective machinery fall clearly within the definition of consequential damages. These expenses were not the direct and natural consequences of the asserted breach, but were the apparent consequence of a third factor— the requirement that ships and machinery undergo certain testing prior to delivery to the Department of the Navy. Certainly, in the absence of the limitation with respect to consequential damages, these expenses could be considered to have been within the contemplation of the parties and thus, though clearly special damages, recoverable by Marietta. However, since they were the consequence of the testing requirement, a special circumstance of which the parties definitely were aware, and not the direct consequence of the asserted breach, they may appropriately be labeled "special damages" and, consequently, are not recoverable by Marietta in this action. The motion of Westinghouse insofar as it applies to this type of damage, accordingly, is granted, and the claims of Marietta for such damages as set forth in its counterclaim in paragraphs numbered 5, 14, 15 and 16 will be dismissed.

## DAMAGES SUSCEPTIBLE OF RECOVERY BY MARIETTA UPON PROPER PROOF

■ (a) *Marietta's Claim for Expenses for Removing and Installing Defective Machinery:* Both the guaranty clause contained in Marietta's purchase order and the warranty clause contained in the acknowledgment sent by Westinghouse provide that Westinghouse shall be responsible for either the "repair or replacement" of defective machinery. In its brief, Westinghouse cites a number of cases in which recovery of damages has been limited to substitution of a new part or piece of machinery for one which has proven defective. Based upon the reasoning applied in these cases, Westinghouse argues that Marietta is barred from recovering expenses it incurred in removing and reinstalling the defective items of machinery. However, in examining the cases submitted by Westinghouse, the Court notes that none contained the precise language used in the instant case, that is, "repair or replacement" of defective workmanship or defective material. Thus, a claim for installing defective machinery is distinguishable from one for testing machinery.

By agreeing not only to replace the defective part, but also to engage in an actual process of repairing the machinery, including presumably the obligation to take all necessary steps to correct the machinery and to put it in working order, Westinghouse obligated itself to remove the defective part, take whatever steps were necessary to put it in operating condition, and to reinstall that part so that the machinery was once again operable. It is difficult for the Court to conceive how Westinghouse could repair the defective machinery without engaging in the preliminary acts of removing the part and the work necessary to reinstall it. Westinghouse, by its contract, has specifically agreed to repair defective machinery, and the Court finds that by such agreement Westinghouse has obligated itself to bear the expenses necessary to fulfill this obligation.

With respect to the question of whether such expenses are direct or consequential, it would seem that where, as in this case, a seller agrees by its contract to repair or replace defective parts, the expenses necessarily incurred in effecting such repair would be considered to be direct rather than consequential. For instance, when an automobile is repaired pursuant to a warranty, the expense involved in effecting such repair, including removing and installing whatever parts are required to be removed in the course of making the repairs, is a direct consequence of the breach of the warranty. That in a particular case this expense of removal and reinstallation may be more significant or more costly does not change its nature or convert

what would otherwise be direct into consequential damages. Thus, it is not the amount of work involved or the size of the expenditure which determines whether such expenses are direct or consequential, but rather whether such expenditures are usual and to be expected in the context of the particular case. Based upon this analysis, the courts have permitted buyers to recover expenses incurred in effecting a correction or repair of defective machinery or merchandise, even where the contract specifically. excludes the seller from liability for consequential damages. See Donnelly v. Governair Corporation, 145 F.Supp. 699 (N.D.Cal.1956); Camilla Cotton Oil Company v. Spencer Kellogg & Sons, Inc., 257 F.2d 162 (5th Cir. 1958); Clark v. Ferro Corporation, 237 F.Supp. 230 (E.D.Tenn.1964); 77 C.J.S. Sales § 330, at p. 1194. The Court, of course, takes no position with respect to the reasonableness or necessity of these particular expenses claimed by Marietta in its counterclaim, for a decision with respect thereto will have to await development of the evidence at trial. Accordingly, insofar as the motion for Westinghouse for summary judgment is directed to Marietta's claim for damages for removing and reinstalling the defective machinery, as contained in the counterclaim in paragraphs numbered 2, 3, 4, 8, 11 and 13, and parts of 7 and 10, the Court finds that Westinghouse has failed to show entitlement thereto as a matter of law.

■■■ (b) *Marietta's Claim for Delay Damages:* With regard to the question of delay damages, the provisions of the Marietta purchase order and Westinghouse's so-called acknowledgment are in irreconcilable conflict. For example, the Westinghouse acknowledgment provides:

"Westinghouse shall not be liable for loss, damage, detention or delay resulting from causes beyond its reasonable control or caused by fire, strike, civil or military authority, restrictions of the U. S. Government or any department, branch or representative thereof, insurrection or riot, embargoes, car shortages, wrecks or delays in transportation or inability to obtain the necessary labor, materials or manufacturing facilities due to such causes. Receipt of the apparatus by the Purchaser upon its delivery shall constitute a waiver of all claims for damages."

On the other hand, the provision in Marietta's purchase order provides that,

"Time is of the essence and the Vendor will commence, prosecute and complete the work, including the furnishing of drawings, with due diligence and make shipments, all as specified in the attached Purchase Order and Vendor shall be responsible for all damages which are proximately caused by Vendor's delay."

It might be argued that, since both the purchase order and the "acknowledgment" relieve Westinghouse of responsibility for consequential damages, the damages for delay, which would clearly appear to be consequential damages in the context of this case, would be barred irrespective of which document was controlling. However, in view of the settled rule of construction to the effect that where there is a repugnancy between general and specific clauses in a contract, the latter will govern [see Taylor v. Buffalo Collieries Co., 72 W.Va. 353, 356, 79 S.E. 27 (1913); Restatement of Contracts § 236(c)], it would appear that the specific clause relating to delay would cover the question of damages rather than the general provision with regard to consequential damages. Under such circumstances, it becomes important to determine which of the two clauses set forth above is applicable.

■■■ The Uniform Commercial Code was not in effect in West Virginia at the time the parties entered into the contract in this case, therefore, pre-code law would govern the determination with respect to which of the two clauses should be applied. At the time the parties negotiated the contract, West Virginia courts applied the so-called "mirror image" rule. Under that rule, a purported acceptance of an offer which attempt-

ed to modify one or more of the terms of the offer was in legal effect a rejection of the original offer and a counter-offer in lieu thereof. Hancock v. Fletcher, 113 W.Va. 624, 627, 169 S.E. 457 (1933); 1 Williston, Contracts § 77 (3rd Edition). Whether there is an acceptance of this counter-offer depends upon the particular facts of the individual case. An expressed consent is not necessary and language and conduct on the part of the original offeror indicating his assent to the new terms and conditions is sufficient. See 135 A.L.R. 821.

In applying these principles to the present case, however, the Court finds that the record is not sufficiently developed to enable it to determine the positions of the respective parties insofar as offers, counter-offers and acceptances are concerned. For instance, Westinghouse, in its brief, states that "apparently the parties negotiated on the reduced purchase price" and "apparently Purchase Order AG 2900 of February 20, 1962, was only verbal." There is no direct evidence in the record concerning the nature or effect of the negotiations on these two occasions, nor is it clear from the record whether the initial offer, after the original termination, was made by Westinghouse or Marietta. As a result of these deficiencies in the record, the Court is unable to determine which of the conflicting provisions with respect to delay damages is controlling, and since the burden of proof on motion for summary judgment is imposed upon the party making such motion, the Court, at this time, must deny the motion of Westinghouse insofar as it relates to the issue of damages for delay claimed by Marietta in its counterclaim.

(c) *Other Items of Marietta's Claim for Damages:* Remaining to be considered are the items of damages set forth in Marietta's counterclaim in paragraphs numbered 1, 22, 23, 24 and 25. The Court is unable, upon the basis of the record before it, to determine with any degree of precision, the nature or basis for these damages. This results in part from the fact that the only tangible facts

presently before the Court with respect to such damages consist of answers to interrogatories which, by their very nature, are not particularly informative. The issue with reference to these items of damages is further complicated by the fact that these damages are expressed in terms peculiar to the shipping and shipbuilding industries and, therefore, are not easily classified as either direct or consequential, especially on the basis of the record presently before the Court. For this reason, the Court must await a further development of the evidence, either by discovery or at trial, before it can make an informed judgment. Under such circumstances, Westinghouse's motion for summary judgment with respect to items 1, 22, 23, 24 and 25 must necessarily fail.

## APPENDIX

*Damages Claimed by Marietta in its Amended and Supplemental Counter-Claim*

1. Trouble with oil leaks—generators. Labor, supervision, overhead, insurance, taxes, etc.     $ 3,500.00

2. Expense in removing defective generator during river trials of AGOR 6. Labor, overhead, insurance, supervision, taxes, etc., at Point Pleasant     896.00

3. Reinstall generators at Point Pleasant. Labor, supervision, overhead, insurance, taxes, etc.     4,000.00

4. Expense in removing defective generator on AGOR 7 during trial runs. Labor, supervision, overhead, insurance, rental equipment, taxes, etc., at New Orleans, Louisiana     1,016.00

5. Retesting repaired generator when reinstalled     896.00

6. Expense in correcting defective wiring in brakes on crane system on AGOR 7     140.00

7. Expense at New Orleans on trial of AGOR 7 due to failure of Westinghouse equipment.
Labor, supervision, overhead, insurance, taxes, etc.     56,000.00
Plus food for men     4,212.00
Plus expense of other vendors due to Westinghouse equipment failure     4,042.00
Plus Marietta's managerial personnel cost and expense     3,000.00

8. Second reinstalling of generator after first generator failure.
Labor, supervision, overhead, insurance, taxes, etc.     4,000.00
Retesting generator after installation     2,000.00

9. Expense in waiting for trial board inspection due to Westinghouse machinery failure     15,000.00

10. Expense in connection with armature failure.
Labor, supervision, overhead, insurance, taxes, etc. (Third time)     896.00

11. Expense in removing armature     500.00

12. Costs of crew on vessel waiting on Westinghouse to repair armature to be reinstalled.
Labor, supervision, overhead, insurance, taxes, etc.     8,000.00

13. Costs reinstalling repaired armature.
Labor supervision, overhead, insurance, taxes, etc.     4,000.00

14. Cost of retesting by trial runs of vessel.
Labor, supervision, overhead, insurance, taxes, etc.     1,600.00

15. Additional and extra costs in trial test of vessel after armature was repaired     3,500.00

16. Cost and expense—labor, supervision, overhead, insurance, taxes, etc.— two special speed trials— $1,000.00 each     2,000.00

17. Expense of maintaining vessel while vessel was out of operating order due to Westinghouse's equipment failure and breakage.
Labor, supervision, overhead, insurance, taxes, etc.     9,600.00

18. Cost of drydocking AGOR 7 at Algiers Iron Works Company as result of Westinghouse equipment failure—paid to Algiers Iron Works     1,000.00

19. Westinghouse purchase order to Marietta to repair other defects in Westinghouse equipment     3,751.85

20. Expense due to late delivery of index power panels     200.00

21. Expense in changing and repairing locks furnished by Westinghouse     200.00

22. Correcting, changing and making new instrumental manuals for Westinghouse equipment.
Engineering staff, labor, supervision, overhead, insurance taxes, etc.     1,500.00

23. Labor, overhead, supervision, insurance, taxes, etc., in repairing, cleaning depth micrometers and installing same     250.00

| | |
|---|---:|
| 24. Costs and expenses—labor, overhead, supervivision, insurance, taxes, etc.—in drying out anchor windlasses | 250.00 |
| 25. Marietta's expenses in testing, redoing and correcting valves and air actuators. Labor, overhead, supervision, insurance, taxes, etc. | 6,000.00 |
| 26. Marietta's costs, expenses and damages due to Westinghouse delays and late deliveries of equipment from time schedule | 50,000.00 |
| Total | $191,949.85 |