**POTOMAC ELECTRIC POWER COMPANY, Plaintiff,**

**v.**

**WESTINGHOUSE ELECTRIC CORPORATION, Defendant.**

**Civ. A. No. 1794–72.**

United States District Court,
District of Columbia.

Nov. 21, 1974.

574

Hamilton and Hamilton, Stephen A. Trimble, Richard W. Turner, Nicholas D. Ward, Washington, D. C., for plaintiff.

Covington & Burling, James C. McKay, Christopher H. Buckley, Jr., George R. Poehner, Vincent L. Ricci, Washington, D. C., for defendant.

## MEMORANDUM OPINION

PARKER, District Judge.

Potomac Electric Power Co. (PEPCO), a District of Columbia corporation, seeks compensatory and punitive damages from Westinghouse Electric Corporation (Westinghouse), a Pennsylvania corporation, arising from an alleged contract breach for the manufacture and sale of a steam turbine-generator. The dispute stems from the failure and malfunction of the unit located at PEPCO's Morgantown Generating Station at Newberg, Maryland.

The complaint alleges negligence, gross negligence, misrepresentation, breach of contract to repair or replace, breach of warranties, and breach of express guarantees. In response to the complaint, Westinghouse relies upon various defenses and contends particularly that the pleading fails to state a cause of action and that the plaintiff is estopped from asserting any claim and has waived any right to consequential damages by virtue of the express provisions of the contract. This Court has jurisdiction pursuant to 28 U.S.C. § 1332, there being diversity of citizenship and the amount in controversy exceeding the sum of $10,000.

Following extensive discovery by the parties the defendant moved for summary judgment pursuant to Rule 56, Federal Rules of Civil Procedure, contending that the pleadings, depositions, answers to interrogatories and admissions show that there was no genuine issue as to any material fact and that accordingly, it was entitled to judgment. Memoranda of law in support of and in opposition to the motion have been considered together with the pleadings, depositions, affidavits and oral argument of counsel.

The Court concludes that there is no genuine issue as to any material fact and that the defendant is entitled to summary judgment as a matter of law.

The contract negotiations between the parties began in 1966, extended over several years, and in 1970 were finally consummated in the State of Pennsylvania.[1] The machinery was manufactured and delivered to PEPCO in Pennsylvania.

In the summer of 1970 the turbine generator was placed in commercial operation in the State of Maryland. A few months later, on November 29, 1970, a malfunction developed causing substantial damage to the turbine portions of the unit. As a consequence, the unit was out of service until June of 1971. While other problems subsequently developed in 1971 and 1972, causing the unit to be shelved from service for short periods of time, PEPCO's major claim stems from the breakdown of the machinery in November 1970.

## THE CONTRACT PROVISIONS

The rights and obligations of the parties are contained in a fully detailed and integrated written contract.[2] The controlling provisions are found in the section titled "GENERAL CONDITIONS" and more particularly in the subsections designated "WARRANTY" and "LIMITATION OF LIABILITY."[3] Under the

1. The contract was negotiated on behalf of PEPCO by two officers highly experienced in contract negotiations: L. W. Cadwallader, former Vice Preisdent of Generating, and John C. Herbert, Vice President of Purchasing and General Services. Cadwallader's duties included executive responsibility for the design, operation, manufacture, and construction of all of PEPCO's generating facilities, and also involved the purchase of new equipment.

2. There is no dispute and in fact the parties agree that Pennsylvania law applies to the validity of the contract provisions and the rights and obligations created thereby.

3. The relevant portions of the contract are set out in Appendix A.

first subsection the defendant expressly warranted that the equipment would be of the kind and quality described in the contract and would be free of defects in workmanship or material for one year. In the event of a breach of this warranty, upon notification of the defect and substantiation of proper maintenance and operation, the defendant was only required to repair or replace the non-conforming part at its expense. The parties further agreed that, except as to title and patent infringement, there were no other warranties, express or implied, of merchantability, fitness for purpose, or other warranties. This last provision of the warranty was conspicuously underlined. The liability limitation subsection of the contract also specifically provided that the defendant would in no event be liable

". . . for special, or consequential damages, such as, but not limited to, damage or loss of other property or equipment, loss of profits or revenue, loss of use of power system, cost of capital, cost of purchased or replacement power, or claims of customers of Purchaser for service interruption . . . ."

■ Within the framework of this commercial transaction the Court perceives no valid legal reason why PEPCO should not be held to the clear and express provisions of the written agreement between the parties. Warranty and limitation of liability clauses such as found in the present contract, which restrict PEPCO's remedies to the repair and replacement of non-conforming parts and limit Westinghouse's liability, regardless of its negligence in causing such nonconformities, are valid and enforceable and have been consistently upheld by the courts. They are also consistent with Sections 2–316(4) and 2–719(1)(a) and (3), Uniform Commercial Code.[4] Provisions such as those precluding PEPCO from recovering consequential damages have likewise been up-held as valid and enforceable. Applying Pennsylvania law, the following cases are instructive: Southwest Forest Industries, Inc. v. Westinghouse Electric Corp., 422 F.2d 1013 (9th Cir.), cert. denied, 400 U.S. 902, 91 S.Ct. 138, 27 L. Ed.2d 138 (1970); Wyatt Industries, Inc. v. Publicker Industries, Inc., 420 F. 2d 454 (5th Cir. 1969); K&C, Inc. v. Westinghouse Electric Corp., 437 Pa. 303, 263 A.2d 390 (1970). Other courts have reached the same conclusion: United States ex rel. Westinghouse Electric Corp. v. Marietta Manufacturing Co., 339 F.Supp. 18 (S.D.W.Va. 1972); Fire Association of Philadelphia v. Allis Chalmers Manufacturing Co., 129 F. Supp. 335 (N.D.Iowa 1955); McGregor & Werner Graphics, Inc. v. Cottrell Co., C.A.No.517–72 (D.D.C., Dec. 21, 1972), aff'd (D.C.Cir., No. 73–1213, Feb. 14, 1974).

## THE NEGLIGENCE CLAIMS

PEPCO charges Westinghouse with tortious conduct in: designing, planning and manufacturing of the malfunctioning unit; advising, monitoring and rendering technical services in connection with its operations, repairs and adjustments; and failing to warn of incidents previously disclosed to defendant relating to a similar unit.

But, again the express and certain language of the contract should be noted. The warranty and limitation of liability provisions specifically relieved defendant from any liability based on negligence or tort. The "WARRANTY" clause provided in part that

"Correction of nonconformities, . . . shall constitute fulfillment of all liabilities . . . to the Purchaser, whether based on contract, *negligence or otherwise* with respect to, or arising out of such equipment." (emphasis added).

Likewise, the "LIMITATION OF LIABILITY" clause of the contract provided that

4. These and other relevant provisions of the Uniform Commercial Code are set out in Appendix B.

". . . the liability of the Corporation [Westinghouse] with respect to any contract, or any thing done in connection therewith such as the performance or breach thereof, or from the manufacture, sale, . . ., installation or use of any equipment covered by or furnished under this contract whether in contract, *in tort*, under any warranty, or otherwise, shall not, except as expressly provided herein, exceed the price of the equipment or part on which such liability is based." (emphasis added).

█ Exculpatory clauses, such as those agreed to by Westinghouse and PEPCO, have been held valid and enforceable by the courts of the State of Maryland [5] where the generator is located as well as by the courts of the State of Pennsylvania and of this jurisdiction. Winterstein v. Wilcom, 16 Md.App. 130, 293 A.2d 821 (1972); Eastern Avenue Corp. v. Hughes, 228 Md. 477, 180 A.2d 486 (1962); *Southwest Forest Industries, Inc., supra,* (applying Pennsylvania law); Dilks v. Flohr Chevrolet, Inc., 411 Pa. 425, 192 A.2d 682 (1963); *McGregor & Werner Graphics, Inc., supra,* (applying District of Columbia law). In *Eastern Avenue Corp., supra,* the Court of Appeals of Maryland observed, "Almost all of the courts that have passed on the question have held exculpatory clauses valid . . ." (citations omitted). 180 A.2d at 488.

Furthermore, the testimony of PEPCO's negotiating officers, Herbert (pp. 69–70) and Cadwallader (pp. 181–183), shows clearly that PEPCO was aware of those provisions of the contract that Westinghouse would not be responsible for any damages suffered by PEPCO arising from negligence by Westinghouse.

PEPCO asserts that its claim should be upheld despite the exculpatory clauses because defendant's conduct was grossly negligent and/or willful and wanton. Neither of the PEPCO officials who testified, however, could point out any facts sustaining a claim that Westinghouse acted in a deliberate, willful, wanton, reckless or grossly negligent manner for the purpose of causing injury to PEPCO (Herbert, pp. 78–80; Cadwallader, pp. 235–239).[6]

█ Additionally, there appears to be little doubt that in a civil negligence case, the Maryland courts do not accept the concept of gross negligence.[7] In Eastern Shore Public Service Company v. Corbett, 227 Md. 411, 177 A.2d 701 (1962), the appeals court considered an instruction by the trial court that it was the jury's "function 'to determine whether or not the said defendant fulfilled its duty of exercising the *very highest degree of care* (italics ours) practicable under all the circumstances of this case'." 177 A.2d at 708. In rejecting the instruction, the appeals court held at 709 of 177 A.2d

"The trial court's instructions . . . placed, we think, too great a burden upon the defendant. Ordinary negligence in this State has traditionally been recognized as a relative term to be measured by the 'reasonable man' standard. The test to be applied is whether the defendant exercised such care and caution as a reasonably prudent man would have exercised under all of the surrounding circumstances of the case, with the *amount* of care and caution corresponding to the capacity to injure, so that the greater the danger, the greater the vigilance required to measure up to the standards of ordinary care. (citations omitted)."

---

5. The substantive tort issues in this proceeding are governed by the law of Maryland.

6. While PEPCO has pursued intensive discovery and has viewed numerous documents and reports of Westinghouse, the record does not support the charges.

7. The same is true in the District of Columbia: Warner v. Capital Transit, 162 F.Supp. 253 (D.D.C.1958); Atchison v. Wills, 21 App.D.C. 548 (1903).

# THE MISREPRESENTATION CLAIM

This claim arises from statements included in a sales brochure prepared by Westinghouse relating to certain elements of the turbine-generator offered for sale. First, PEPCO alleges that without notice or knowledge to them modifications were made in the unit purchased from the defendant which differed from the representations set out in the brochure. These modifications increased the likelihood and susceptibility of a malfunction by the unit. Second, PEPCO claims it relied on other misrepresentations in the brochure relating to the defendant's design, experience and the reliability of its turbine generators.

■■ The plaintiff does not contend that Westinghouse acted fraudulently or that it knowingly made any misrepresentation, but rather, that Westinghouse made "innocent misrepresentations" which caused PEPCO to suffer certain damages.[8] The law of Maryland, where the injury and damage occurred, determines the rights and liabilities of the parties in this tort claim for misrepresentation. There is no authority, however, to support a cause of action under Maryland law for an "innocent misrepresentation." The cause of action is for fraud and deceit and to support recovery the plaintiff must show falsity and knowledge by the defendant or reckless indifference, with the intent to deceive the plaintiff and reliance by the plaintiff on the defendant's statements. Peurifoy v. Congressional Motors, Inc., 254 Md. 501, 255 A.2d 332 (1969); Lambert v. Smith, 235 Md. 284, 201 A. 2d 491 (1964); Schnader v. Brooks, 150 Md. 52, 132 A. 381 (1926). PEPCO's pleadings and submissions on the summary judgment motion on this issue fall short of asserting a cause of action for fraud and deceit. Nor does the testimony of the officers who negotiated the contract show reliance on the part of PEPCO. (Herbert, p. 112; Cadwallader, pp. 49–50, 218–220).

■ And again, the Court notes that any damage claim arising from misrepresentations is precluded by the clear provisions of the contract.

## THE BREACH OF WARRANTY TO REPAIR OR REPLACE

PEPCO claims that during the warranty period certain components of the unit became defective which were not repaired or replaced by Westinghouse as required under the contract. The argument advanced in this connection is that before the November 1970 failure, Westinghouse had knowledge of, but failed to correct, certain defects in the unit sold to plaintiff and further that the defendant was "on notice" because of the breakdown of a similar type of unit manufactured by them approximately one year earlier.[9] Because of these events plaintiff contends that the defendant should have made repairs *prior* to the November 1970 failure.[10]

The warranty provisions of the contract provide in relevant part that

"Should any failure to conform to this warranty appear within one year after the initial date of synchronization, [Westinghouse] shall, *upon notification* . . ., correct such nonconformities . . . at its option, by suitable repair or replacement . . . ." (emphasis added).

■ PEPCO argues that the word "notification" in the warranty provisions is synonymous with the words "notice" or "on notice" and that since Westinghouse had prior knowledge of the later possibility of a malfunction in the defendant's unit, failure to make

---

8. See statement of plaintiff's counsel and the responses of the witness Cadwallader, pp. 238–239.

9. This refers to problems encountered with one of the defendant's turbine generators, all unrelated to this proceeding. There is little if any factual basis in the record to support the argument as that problem was identified with the failure experienced by PEPCO.

10. There is no dispute that Westinghouse did in fact meet its contract obligations to repair and/or replace the parts damaged in the November 1970 failure following notification to them by the plaintiff.

preventive repairs breached the contract warranty. While such an interpretation of the warranty provisions make preventive repairs breached the does indeed lend support to plaintiff's contentions, it also amounts to an unjustifiable distortion of language which is free from ambiguity. General Motors Corp. v. Swan Carburetor Co., 88 F.2d 876, 885 (6th Cir. 1937); *See* 67 Am. Jur.2d, Sales, §§ 728 and 729. Westinghouse was obligated to honor the warranty to repair or replace only after it had received notification of any nonconformity, not after it had been put "on notice."

## THE BREACH OF EXPRESS GUARANTEE

The contract between the parties expressly guaranteed that the turbine-generator would operate efficiently and the maximum heat rate would not exceed a stated limit when operating under specified conditions. PEPCO contends that since initial operation the unit has experienced a heat rate in excess of the guaranteed rate resulting in increased fuel costs. Damages are claimed from Westinghouse because of the increased costs.

A two-pronged argument is advanced by PEPCO: first, that pursuant to § 2–316(1) of the Uniform Commercial Code, the general limitation of warranties in the contract is inoperative in face of the express guaranteed heat rate; and second, that under the circumstances of this case the exclusive remedy to repair or to replace provision of the warranty clause fails in its essential purpose.

Section 2–316(1) provides that language negating or limiting a warranty and language tending to create a warranty should be construed wherever reasonable as consistent with each other. To the extent that such construction is unreasonable, a negation or limitation of warranty is inoperative. In reliance upon that section PEPCO cites several cases: Woodruff v. Clark County Farm Bureau Coop. Ass'n., 286 N.E.2d 188 (Ind.App. 1972); Berk v. Gordon Johnson Co., 232 F.Supp. 682 (E.D.Mich.1964); Henry v. Reichenbach, 45 Pa.D&C.2d 171, 5 U.C.C.Rep.Serv. 985 (1968). In *Woodruff,* 286 N.E.2d at page 200, the court relied upon *Berk,* and commented

" . . . If an expressed warranty and a disclaimer of an expressed warranty exist in the same sale, an irreconcilable conflict emerges. The statute solves the problem by emphasizing that any negation or limitation of an express warranty is inoperative if it is 'unreasonable'. The interpretation of the statute therefore must be that if it is unreasonable or impossible to construe the language of the expressed warranty and the language of the disclaimer as consistent, the disclaimer becomes inoperative."

■ To this first argument the defendant responds, and the Court agrees, that other provisions of the Code, namely § 2–316(4) and § 2–719(1)(a), permit the parties to agree, as they did, to limit PEPCO's remedies for breach of the heat rate guaranty to repair and replacement of nonconforming parts. Moreover, in *Woodruff* the contract was not as precise and comprehensive a document as here; it did not include a limitation of remedies clause as provided in § 2–316(4) and the Indiana court was only concerned with and rejected an attempt to exclude express warranties.

■ In support of the second proposition that the exclusive remedy to repair or replace fails of its essential purpose PEPCO relies upon § 2–719(2) of the Code

"Where circumstances cause an exclusive remedy to fail of its essential purpose, remedy may be had as provided in this subtitle.

But even if the Court accepts PEPCO's contention that the turbine-generator failed to meet the guaranteed heat rate and that as a result they are faced with increased fuel costs, the defendant has conscientiously and continually exerted its best efforts to correct the problem (Cadwallader, pp. 639–640). At no time has Westinghouse repudiated or attempted to escape from the obligations of the warranty. To the contrary, it

has continued to promptly employ every means to correct the heat rate problem under the repair and replacement provisions as well as by continuing research, the benefits of which PEPCO also receives (Cadwallader, p. 639). In United States Fibres, Inc. v. Proctor & Schwartz, Inc., 358 F.Supp. 449 (E.D. Mich.1972) the Court was faced with a situation similar in many ways to this and the Court noted

> "It is true that under Pennsylvania law, a seller may be held liable for consequential damages even where expressly excluded if it has been guilty of willful and dilatory behavior in not honoring its express warranty. (Citations omitted). However, the present case does not present any such issue. Defendant made numerous efforts to repair the equipment, and thus made every effort to live up to its warranty obligations." 358 F.Supp. at 465.

Nor has the plaintiff lost the substantial part of its bargain by virtue of the warranty. The unit is still operative and the increased fuel costs as stated by the plaintiff have not been excessive by any standard.

But in any event the Court considers any increased costs as consequential damages under § 2–715 of the Code and Westinghouse is not responsible for such damages under the express provisions of the contract.

## THE UNCONSCIONABILITY ISSUE

■■■ Finally, plaintiff raises the issue of the unconscionability of the exculpatory clauses. The negotiated agreement between these parties was not a contract between two small unknowledgable shop keepers but between two sophisticated corporations each with comparable bargaining power and fully aware of what they were doing. The negotiations leading to the consummation of the contract were deliberate, detailed and consumed more than two years. PEPCO's representatives were experienced and the final agreement was reviewed by their corporate legal staff. While the evidence shows that other than Westinghouse, there was only one other domestic manufacturer with the capability of marketing the turbine-generator, there is nothing to indicate that PEPCO was precluded from contracting with that manufacturer or even foreign manufacturers. Nor is there any evidence in the record showing that PEPCO was a reluctant and unwilling purchaser, overreached and forced to yield to onerous terms imposed by Westinghouse.

■■■ The principal parties to this litigation, largely through depositions and interrogatories, rather than through untested affidavits, have given testimony on the basic factual issues presented by the pleadings. Further, in response to a request for documents, the defendant has made available to the plaintiff numerous records and reports. In short, the facts have been sufficiently developed and the Court finds that there is no genuine issue as to any material fact and concludes that the law clearly supports the defendant. While PEPCO's counsel suggests that additional discovery could possibly ferret out facts to support its position, summary judgment should not be denied under such circumstances.

The defendant's motion for summary judgment is granted. Counsel will present an appropriate order.

## APPENDIX A

### RELEVANT PORTIONS OF THE CONTRACT BETWEEN THE PARTIES

"1. WARRANTY—The Corporation warrants that the equipment to be delivered will be of the kind and quality described in the order or contract and will be free of defects in workmanship or material. Should any failure to conform to this warranty appear within one year after the initial date of synchronization, the Corporation shall, upon notification thereof and substantiation that the equipment has been stored, installed, maintained and operated in accordance with the Corporation's recommendations and standard industry practice, correct such noncon-

formities, including nonconformance with the specifications, at its option, by suitable repair or replacement at the Corporation's expense.

*"This warranty is in lieu of all warranties of merchantability, fitness for purpose, or other warranties, express or implied, except of title and against patent infringement.* Correction of nonconformities, in the manner and for the period of time provided above, shall constitute fulfillment of all liabilities of the Corporation to the Purchaser, whether based on contract, negligence or otherwise with respect to, or arising out of such equipment. (Emphasis in original).

"2. LIMITATION OF LIABILITY—The Corporation shall not be liable for special, or consequential damages, such as, but not limited to, damage or loss of other property or equipment, loss of profits or revenue, loss of use of power system, cost of capital, cost of purchased or replacement power, or claims of customers of Purchaser for service interruption. The remedies of the Purchaser set forth herein are exclusive, and the liability of the Corporation with respect to any contract, or any thing done in connection therewith such as the performance or breach thereof, or from the manufacture, sale, delivery, resale, installation or use of any equipment covered by or furnished under this contract whether in contract, in tort, under any warranty, or otherwise, shall not, except as expressly provided herein, exceed the price of the equipment or part on which such liability is based."

### APPENDIX B

### UNIFORM COMMERCIAL CODE
Title 28:1–101 et seq.,
D.C.Code

*Relevant Portions*

§ 28:2–316. *Exclusion or modification of warranties*

(1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this article on parol or extrinsic evidence (section 28:2–202) negation or limitation is inoperative to the extent that such construction is unreasonable.

(2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

(3) Notwithstanding subsection (2)

(a) unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is", "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; and

(b) when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him; and

(c) an implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade.

(4) Remedies for breach of warranty can be limited in accordance with the provisions of this article on liquidation or limitation of damages and on contractual modification of remedy (sections 28:2–718 and 28:2–719). (Dec. 30, 1963, 77 Stat. 648, Pub.L. 88–243, § 1, eff. Jan. 1, 1965.)

§ 28:2–715. *Buyer's incidental and consequential damages*

(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

(2) Consequential damages resulting from the seller's breach include

(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(b) injury to person or property proximately resulting from any breach of warranty.

(Dec. 30, 1963, 77 Stat. 668, Pub.L. 88–243, § 1, eff. Jan. 1, 1965.)

§ 28:2–719. *Contractual modification or limitation of remedy*

(1) Subject to the provisions of subsections (2) and (3) of this section and of the preceding section on liquidation and limitation of damages,

(a) the agreement may provide for remedies in addition to or in substitution for those provided in this article and may limit or alter the measure of damages recoverable under this article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts; and

(b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

(2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this subtitle.

(3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not. (Dec. 30, 1963, 77 Stat. 669, Pub.L. 88–243, § 1, eff. Jan. 1, 1965.)