### MACKLEM v. FALES.

CONTRACTS—SPECIFIC PERFORMANCE—FALSE REPRESENTATIONS—
CORPORATIONS—VOLUNTARY MORTGAGE.

The owners of a patent for a harrow brought suit for the specific performance of a contract by which complainants and defendants agreed to organize a joint-stock company for the manufacture and sale of harrows, the complainants to contribute the patent as their share of the capital, and the dendants money, of which they paid a part. Afterwards the defendants voluntarily caused the company to give a chattel mortgage on all its property to secure its creditors. Had they paid their subscriptions in full, there would have been no debts. Defendants claimed that complainants, when entering into the contract, made false representations as to the expense of selling the harrows. No mention of the expense appeared in the contract. *Held :*

(1) That no fraud was shown which would justify setting aside the contract.

(2) That the chattel mortgage should be set aside.

(3) That the defendants should be decreed to pay the balance of their subscriptions.

Appeal from Wayne; Waite, J. Submitted February 18, 1902. (Docket No. 24.) Decided March 18, 1902.

Bill by William E. Macklem and John H. Brown against James W. Fales, Alexander McVittie, and others

for the specific performance of a contract. From a decree for complainants, defendants appeal. Affirmed.

*Philip T. Van Zile*, for complainants.

*Stevenson & Butzel*, for defendants.

MOORE, J. The relief prayed for in the bill was granted. The defendants have brought the case here by appeal. The opinion of the trial court states the questions involved so clearly that we insert it here.

"On the 7th day of April, 1899, James W. Fales, J. D. Leland, John H. Brown, William E. Macklem, A. W. McVittie, and Frederick D. Rolison entered into a contract wherein said parties agreed to organize a joint-stock company. The rights, duties, and obligations of the parties are set forth in the contract. On the same day, or the day following, the articles of incorporation were executed and signed pursuant to said contract. The organization was for the purpose of manufacturing and selling the Common-Sense harrow and other agricultural implements. The Common-Sense harrow was made under patent issued to the said John H. Brown. This bill was filed by William E. Macklem and said John H. Brown to compel specific performance of the contract, praying, among other things, that the stock of said company be issued to the owners thereof, as provided in said contract, and that said Fales and McVittie pay into the treasury of the company certain moneys, as per the terms of said contract, which were as follows:

" 'Said Fales and McVittie have agreed, and do hereby severally agree, to pay into the treasury of said corporation, as the needs of its business shall require, each the sum of $6,250 in cash.'

" The testimony shows that the business of the company was carried on for some time, and that the company became and is at the present time indebted to certain individuals, aggregating about $9,000. Fales was elected general manager of the company. His son, himself, and McVittie were directors of the company. The proof shows that they refused and neglected to deliver the stock certificates of the company to the owners thereof, and Fales and McVittie have declined to pay in money according to the terms of the contract, beyond the sum of $1,500 each, which has been paid by them into the treasury of the company.

"It is claimed by the defendants Fales and McVittie that the contract is void; they having been induced to enter into the same by false and fraudulent representations on the part of Brown, Rolison, and Macklem. Previous to the contract and organization of the company, the right to manufacture said harrow and the patent for the States of Ohio, New York, Pennsylvania, Virginia, West Virginia, Delaware, New Jersey, and Maryland was owned by Macklem, Brown, Rolison, and J. D. Leland. Their contribution to the capital stock of the company was the right to manufacture said harrows in said territory; and Fales and McVittie, according to contract, agreed to put in the money as against this right. Fales and McVittie claim that false representations were made to them by said Brown and Rolison as to the price which Rolison and Macklem had paid for the territory. But it is conceded finally that Macklem used no deception in this regard, but that Fales was fully advised as to what he had paid before the company was organized, which does not appear to be the fact as to the interest which was claimed to have been purchased by Rolison. However this may be, I don't think Fales and McVittie were induced to go into the company by the price which it is claimed Rolison had paid, as no intimate relations appear to have been shown between Fales, McVittie, and Rolison; nor is there anything to show that they relied upon his judgment as to the value of the territory.

"It is further claimed, as a reason for setting aside this contract, that Brown represented that the harrow could be sold and placed upon the market for 25 cents a section. The evidence shows there was talk concerning this subject at the time, and previous to the signing of the contract. There can be no doubt that the question was discussed, and it seems to be the opinion now, as expressed upon the stand, of Mr. Fales, that Mr. Brown could sell the harrows at that price. But if the contract is set aside by reason of any misrepresentations as to the selling price, or because there was an agreement to sell it at that price, it must be—*First*, because it was a fraudulent representation upon the part of Brown, upon which Fales and McVittie relied; or, *second*, that it was a part of the contract to sell at that price, which has not been fulfilled. In the former case, I hold it was a representation as to what could be done in the future, and therefore could not be made the basis for setting aside the contract on the ground that it was a fraudulent representation. On the other

hand, if it was a contract or agreement to do the work at that price on the part of Brown or any other person, if it was intended to be a part of the contract in question, it should have been embodied therein. If not a part of the contract in question, then the only liability would be upon a separate and distinct contract to perform, and the remedy would not reach to the annulling of the contract in question in this suit. It is not clear to the court that the harrow cannot be sold for the price mentioned; and, further, the court is of the opinion that it was not considered, at the time of the making of the contract, that the provision was to be any part of the same, or that Fales and McVittie intended to make an undertaking to that effect upon the part of Brown or any one else a *sine qua non* of their entering into the contract or organizing the company. Hence I conclude that the contract should stand, and is enforceable. From which it follows that Fales and McVittie should pay into the company the balance unpaid, as provided by the contract, which, according to the evidence, would be $4,750 each. I think that the evidence shows that the needs of the company require that the whole amount should be paid in immediately.

"On the 7th day of November, 1899, the Detroit Harrow & Manufacturing Company, by A. McVittie, president, executed to James W. Fales, trustee, a chattel mortgage upon all the tangible property of the company, to secure the debts of the company, and to secure the payment to said McVittie of $1,500, and to said J. W. Fales of $4,000. This mortgage was determined upon at what is claimed to be a meeting of the board of directors, at which said Fales and McVittie were the moving parties, and without having been demanded by the creditors of the company. Such mortgage, as before stated, covers all tangible assets of the company, and really is a conveyance of all its property. Good faith upon the part of the directors demanded that the stockholders should have been notified; and the law requires that the directors, at least, should have been notified, and also should have been notified of the purpose of the meeting. It does not appear to me that such was the case, however. The conditions of this mortgage are as follows:

"'That if the said Detroit Harrow & Manufacturing Company shall pay or cause to be paid to the said several parties to whom it is indebted as aforesaid the amount, with interest, of said indebtedness, and also all costs and expenses as hereinafter provided then this

obligation is to be void; otherwise to remain in full force and effect. But if default shall be made in the payment of said debts or demands, or any thereof, or the interest fail, or any portion thereof, as the same shall become due, then the party of the second part is authorized to take possession of and manage the said business of the said first party, complete and carry out its contracts, and sell said property, or any portion thereof, in such manner as he shall deem best for the parties interested in said trust, either at public or private sale, in bulk or in parcels, in the ordinary course of business or otherwise, at such times and on such terms as may, in his discretion, be advisable, and for the best interests of the said creditors and of the party of the first part; and he is hereby authorized to collect all its book accounts and bills receivable, and to that end to use the ordinary means, including the use of the first party's name, but at his own expense as trustee, and, after all reasonable efforts have been exhausted to collect such accounts, to sell, after five days' notice to said first party, the same, or such portion thereof as may remain uncollected. And said trustee is hereby authorized, at any time when he shall deem himself, for said indebtedness, or any portion thereof, insecure, or if said party of the first part shall sell or assign or dispose of, or shall remove or attempt to remove, the whole or any portion of said property from the city of Detroit, without the written consent of the said party of the second part, except in the usual course of trade, then from this time to enter upon said premises, or any place or places where said mortgaged property or any part thereof may be, and take possession thereof, and sell and dispose of the same, or so much thereof as may be necessary to pay the expenses incurred in and about the taking of possession of said property, and in the care thereof, and in and about the foreclosure of this mortgage, the costs and charges, taxes and insurance, hereinafter mentioned, and the claims and indebtedness hereinbefore mentioned, and each and all thereof, and the interest thereon.'

"Then it provides that he may pay taxes, insurance, and attorney's fees, and a reasonable compensation to himself for his services as trustee, etc.

"It will be seen by this instrument that the entire business was taken from the hands of the company, and placed in the hands of Fales, or might be, at his will and pleasure. It is proposed to secure Fales, and provide for the payment to him of $4,000, which the court holds he was not entitled to; and to said McVittie the sum of $1,500, which he was not entitled to. The terms of the mortgage are as severe as would be expected between antagonistic and hostile parties, and the management of the business, the disposition of the property, is all placed in the hands of

one who, to say the least, was not, at the time of the giving of the mortgage, displaying any great amount of zeal in the interests of all the stockholders. I do not think the mortgage ought to be sustained. In my judgment, the courts ought not to look with favor upon transactions of this kind. It really amounts to the gratuitous mortgage given by parties to secure themselves, without notice to the stockholders or to all the parties interested. The mortgage, therefore, will be set aside and held for naught.

"When the money is paid into the company by Fales and McVittie pursuant to the terms of the contract, the company will not be insolvent. Hence the court does not feel at liberty to provide for a receiver at this time, but the future destiny and management of the company should be left to the stockholders and board of directors, who, it is assumed, will act in good faith for the best interests of the company.

"Some question might be raised as to the rights of the creditors. It doesn't appear from the evidence that the creditors, outside of Fales and McVittie, ever requested the mortgage or ever accepted it, or in fact, at this time or at any other time, have relied upon it as security for their claims; but they are fully protected, or will be upon the payment by Fales and McVittie of the amount mentioned, which will make the corporation solvent and place it in a position to pay the debts, to which, in the opinion of the court, that money ought to be dedicated first of all.

" I can see no legal reason for not delivering the certificates of stock to Macklem. They should be so delivered.

"A decree may therefore be entered providing (1) that the certificates of stocks be delivered to Macklem and others, if there are any others to whom they belong; (2) that the contract is valid and binding, and Fales and McVittie should pay into the treasury of the company the balance as mentioned above; (3) that the chattel mortgage purporting to have been given by the company to Fales as trustee be set aside."

The legal proposition discussed by counsel for defendants is stated by them as follows:

"Undoubtedly equity has jurisdiction, where a person has been induced by fraudulent representations to enter into a partnership, to rescind the contract at his instance, and put an end to it *ab initio.*" *Oteri* v. *Scalzo,* 145 U. S. 588 (12 Sup. Ct. 895).

It is insisted that Mr. Fales and Mr. McVittie were induced to enter into this contract by means of fraudulent representations, and especially by the statement that the harrow could be sold at the expense for selling of 25 cents a section. It is said this was not an expression of an opinion simply, but was made in bad faith, by one possessing superior knowledge, and with the intention to deceive, and, this being so, defendants could refuse to go on with the contract; citing *French* v. *Ryan*, 104 Mich. 630 (62 N. W. 1016). In this connection it is a somewhat significant fact that, in the written contract which was entered into by the parties, no suggestion is made as to what the expense would be for selling the harrows.

The record is very long. A great deal of testimony was taken. The circuit judge was of the opinion no fraud was shown which would justify setting aside the contract. We agree with him in that conclusion. See *Gordon* v. *Butler*, 105 U. S. 553, 556; *Pike* v. *Fay*, 101 Mass. 134; *Dawe* v. *Morris*, 4 L. R. A. 158, and note (s. c., 149 Mass. 188, 21 N. E. 313, 14 Am. St. Rep. 404); "Matters of Opinion," Cooley, Torts, p. 483; *French* v. *Ryan*, 104 Mich. 625, 630 (62 N. W. 1016). The important question is one of fact. It would profit no one to set out the testimony here, or to attempt to analyze it. We shall content ourselves with saying we agree with the conclusions reached by the circuit judge.

The decree is affirmed, with costs.

HOOKER, C. J., GRANT and MONTGOMERY, JJ., concurred. LONG, J., did not sit.