**U. S. FIBRES, INC., a Michigan corporation, Plaintiff,**

v.

**PROCTOR & SCHWARTZ, INC., a Pennsylvania corporation, Defendant and Third-Party Plaintiff,**

and

**U. S. EQUIPMENT CO., a Michigan corporation, Third-Party Defendant.**

**Civ. No. 32942.**

United States District Court,
E. D. Michigan, S. D.

Dec. 1, 1972.

See also D.C., 358 F.Supp. 467.

---

[1]. Treasury Regulation § 1.401–10(e) states that for the purpose of § 401 a sole proprietor is considered to be his own employer.

452

William Merrill, Detroit, Mich., for plaintiff (U. S. Fibres, Inc.) and third-party defendant (U. S. Equipment Co.).

Neill T. Peters, Frederick R. Damm, Detroit, Mich., Charles N. Sellick, Philadelphia, Pa., for defendant and third-party plaintiff (Proctor & Schwartz.

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR INVOLUNTARY DISMISSAL

KAESS, Chief Judge.

This is a civil action for damages, claiming fraud, breach of express warranties, breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose, and negligence. Jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332.

After plaintiff had completed the presentation of its evidence, the defendant moved for a dismissal on the grounds that, upon the facts and the law, the plaintiff has shown no right to relief. Rule 41(b), Federal Rules of Civil Procedure.

Between 1960 and 1963, Mr. Dan Steuernagel, then employed at the Lockport Mills in Buffalo, New York, was working on a process to produce a resinated cotton pad. This process consisted of introducing a dry resin into a fluffy cotton pad, curing the resinated pads under heat, and then reducing the thickness of the pad by pressure.

In 1962, Mr. William Clapp, then employed by C. H. Masland & Sons, became aware of this process of producing resinated pads. Clapp and Steuernagel then contacted various car makers who expressed interest in the cotton pads. Mr. George Simon, of Detroit, was then persuaded to supply the capital to form a company to supply padding. There was an agreement to become a licensee of Lockport Mills; however, with the ensuing financial demise of Lockport Mills, this venture was· abandoned. Mr. Steuernagel then went with Allen Industries and continued to work on padding.

Two years later, in the spring of 1965, Steuernagel advised Clapp that he believed that Proctor & Schwartz (P&S), of Philadelphia, could supply the machinery necessary to produce the resinated padding. Simon indicated that he was interested, but suggested that tests be conducted at the P&S laboratory to determine whether the P&S machinery could produce padding to the specifications required by the Ford Motor Company. The Ford specifications described various sound absorption pads of from $\frac{1}{4}$ inch to 1 inch thick and of various densities and weights. The maximum density of the pads in these specifications was 4 lbs./cu. ft.

Near the end of April, 1965, Steuernagel inquired of P&S as to the cost of a

duo-form and related components by letter dated May 5, 1965. P&S replied that the cost would be $50,945.00. This inquiry precipitated further communications with P&S, and late in 1964, Steuernagel contacted Mr. Christiansen of P&S and told him he wanted to introduce dry resin into the duo-form. Steuernagel asked for a test of the duo-form to determine if it could be used with dry resin. The test was set up by Mr. Christiansen in Philadelphia. In May, 1964, Steuernagel went to the P&S laboratories in Philadelphia to participate in the tests. Steuernagel determined how the resin would be introduced at these tests. Mr. Clapp provided the fibers used in the tests. The Ford specifications were discussed at the tests. Two days of tests were conducted. Using a P&S duo-form and injecting the resin into a cotton pad with a fertilizer spreader, a pad was produced at a rate of 1200 pounds per hour, as set by Steuernagel. Curing was done in an ordinary, stationary oven where the pressure was applied by weights which were held in place by clamps. All of the weights and sizes in the Ford specifications were run successfully.

Following these tests, Christiansen came to Detroit and met with Steuernagel and Simon from May 26 through May 30, 1965. Christiansen brought with him a proposal to supply a duo-form and a drying oven. According to the proposal, the oven was to be capable of producing a cured pad at the rate of 1200 pounds per hour, would be 52 feet long and 8 feet high with conveyors 84 inches wide, and capable of exerting 50 pounds per square inch. Since plaintiff wanted a 96 inch oven, this first proposal was rejected, and a second proposal was submitted on July 10, 1965. This proposal added a second duo-form, changed the width of the oven from 84 inches to 96 inches and the length of the oven from 52 feet to 66 feet. This contract described the oven as being capable of exerting a compressive force of 30 pounds per square foot while maintaining a tolerance of plus or minus 1/32 of an inch over width of the batt. The oven involved in this proposal was being used to cure cotton float in other applications, but had never been used in the application contemplated by the plaintiffs. Likewise, the duo-forms involved in the above quotes had never been used for the application contemplated by the plaintiffs. This July 10th proposal was signed by Simon on July 22, and was countersigned by P&S on July 26, 1965.

The duo-forms were already in existence and the drying oven was fabricated by P&S, based on specifications of other ovens recently constructed by it.

The duo-forms were installed by P&S and were successfully put in operation. There was a delay in the completion of the drying oven. When the drying oven arrived in October, it was a left-handed drying oven while the contract called for a right-handed oven. This necessitated rearranging the utilities which serviced the oven. Numerous difficulties were encountered during installation of the drying oven due to wrong parts being supplied.

Erection of the first production line, consisting of a duo-form and drying oven, was completed and the line started up on January 3, 1966.

Difficulty was immediately encountered with the drying oven. When the oven was started, the conveyor plates bound up as they went around the end of the conveyor. This was caused by the failure of P&S to punch the holes in the right places on the conveyor hinges. The conveyors were taken out of the oven, disassembled, and the hinges were repunched.

On January 20, 1966 the line was started up again and the padding which was produced was acceptable. Upon the completion of the repairs, Proctor paid U. S. Fibres $16,639.00 in "back charges".

Several weeks after Line I began to run, Steuernagel complained to Proctor that the pads which were being produced were wedge-shaped, i. e., thicker on one edge than on the other. In response to this complaint, two service en-

gineers were sent to the U. S. Fibres plant. After adjustments to both the duo-form and the dryer, the line again produced an acceptable product on February 22, 1966. On March 3, 1966, a test showed the dryer was producing pads within the $\pm$ $\frac{1}{32}$nd thickness tolerance.

Between January 20 and June 1, 1966, no complaints were received from U. S. Fibres.

On June 13, 1966, it was discovered that one of the tail sprockets was badly worn. This sprocket was replaced. The following week the conveyor in the dryer jammed because the main head shafts were out of square with the center line of the dryer. To remedy this situation, an alignment was carried out and the squareness of the head shafts and the levelness of the dryer were adjusted. Additional guiding rollers were placed in the compression conveyor and the frame was stiffened. When the conveyor was installed, it immediately became apparent that the conveyors were not running at the same speed. To remedy this situation, a clutch was installed on July 24, 1966.

In August, 1966, there was an additional payment of back charges by Proctor to U. S. Fibres.

From July of 1966 to January of 1967 Line I continued to operate. In January of 1967 the compression conveyor wore through its tracks. Between January and February, 1967, Proctor added structural steel to the compression conveyor of Line I. The framework was supported, cross beams were installed, and a system was designed to restrain side to side sway of the compression frame. After this work was completed, Line I continued to operate through June of 1969, when it was dismantled.

On March 23, 1966, at U. S. Fibres request, a proposal for a second dryer was submitted by Proctor. The proposal was accepted and Proctor embarked on the construction of the dryer. This contract also contained a provision concerning tolerance but was written in terms of conveyor deflection, instead of pad thickness. During the fabrication of the Line II dryer, many of the above mentioned repairs were being carried out on the Line I dryer.

In September, 1966, the Line II dryer was delivered, erected, and put into operation in mid-November of 1966.

In January of 1967 two clutches were installed on Line II. In response to a complaint that the pad from Line II was barrel-shaped across its width, the compression conveyors were removed and sent to Proctor for straightening. The conveyor was returned and installed in April of 1967.

Stiffeners and gussets were also added at this point. Pads which were $\frac{3}{8}$ of an inch thick and which weighed 70 grams per square foot were produced on the Line II dryer, both prior to and subsequent to the April, 1967 repair. This pad had a density in excess of 4 lbs./cu. ft.

No complaints were registered by U. S. Fibres until late in November, 1967. At this time, a letter setting out a great many complaints was sent to Proctor.

It appears that on numerous occasions padding in excess of 4 lbs./cu. ft. density in the Ford Specifications was produced by U. S. Fibres.

The Line II dryer was run between April, 1967, and March, 1968, on various pads, many of which were more than 4 lbs./cu. ft. density. On many occasions, Line II ran two shifts a day.

Starting in June, 1966, the court finds that U. S. Fibres started to produce pads on Line I which exceeded a density of 4 lbs./cu. ft. For example, in June, 1966, U. S. Fibres produced a product of density of 4.6 lbs./cu. ft.

From June, 1966, a wide variety of other products was produced for automotive applications ranging in density up to 9.5 lbs./cu. ft. On June 2, 1966, U. S. Fibres delivered three 100-yard lengths of 6.0 lbs./cu. ft. density pad to one of its customers. Shortly after delivery, U. S. Fibres registered its complaint that the tail sprocket was worn.

In 1967, U. S. Fibres began to produce a product called "carpetmate", of a density of 7 lbs./cu. ft. Later, it produced a product called "Flameguard", which had a thickness under $\frac{1}{4}''$ and 8 lbs./cu. ft. in density. U. S. Fibres continued to run high density pads until its demise in 1969.

Furthermore, it appears that some of the pads which were being produced were extremely non-uniform in density. For example, one sample produced in July, 1967 showed a variation in density of 8.3 lbs./cu. ft. to about 4.5 lbs./cu. ft.

This data demonstrated to the court that U. S. Fibres had very little control over the uniformity of its product with regard to density. Thus, it appears that, even at an early date, U. S. Fibres could have been overloading the dryer to cure what it considered nominal 4 lbs./cu. ft. density pad.

It also appears that high density pads were run on the dryer in Line II. For example, between May and November of 1967, on three separate occasions, U. S. Fibres produced pads of about 6 lbs./cu. ft. density.

In the plaintiff's case, it introduced test results, which it claims showed that a compressive force of less than 30 lbs./sq. ft. was necessary to compress all pads which it manufactured. However, this data seemed to indicate that the reduction of the 102 gram material to a thickness necessary to produce a pad of 7 lbs. density would be in excess of the 30 lb. rating of the dryers. Furthermore, during plaintiff's own courtroom demonstration, it was not possible to compress a 69 gram pad to a thickness of $\frac{3}{8}$ of an inch with a force of 42 pounds.

The parties entered into written contracts in connection with the purchase of all of the equipment involved in this case. Each contract contained a long description of the equipment to be supplied. Included in the contract of June 10, 1965 are the following provisions:

*"Performance.*

The herein described machine is designed to cure resin impregnated cotton batting at the rate of 1200 pounds per hour.

It should be noted that in view of the variables present affecting the capacity of the machine, no guarantee can be extended. However, the Company's standard warranty outlined later in this contract does apply."

\* \* \* \* \* \*

"CONVEYORS

A. Carrying Conveyor

This conveyor consists of plain steel plates with $\frac{1}{8}''$ diameter holes on $\frac{3}{16}''$ centers. These conveyor plates have an effective width of 96'' and are attached to two runs of plain steel 8'' pitch roller chain riding on wear strips fastened to rugged steel track. Each plate has a rugged separate supporting girt and is interlocked with a special piano hinge joint. This conveyor is especially designed to hold a tolerance of $\pm \frac{1}{32}''$ across the width of the batt, based on a 30 pound per square foot compressive force.

B. Holddown Conveyor

The holddown conveyor has materials of construction as above. It is designed and fabricated so that its pitch line coincides with the pitch line of the carrying conveyor.

This conveyor is designed so that it is easily adjustable through a motorized set of mechanical jacks located at the appropriate intervals on the roof along the length of the machine."

\* \* \* \* \* \*

"GENERAL PROVISIONS:

1. The Company warrants the machine against defects in materials or workmanship, but makes no other warranties, express or implied (except as set forth under 'Patents') unless the word 'guarantee' is used. Warranties of merchantability or of fitness for a particular purpose or arising from a course of dealing or usage

of trade, are specifically excluded. The Purchaser agrees that any affirmations of fact, description of the machine or sample or model machine herein referred to, whether or not the same relate to production or capability of the machine to perform, are not the basis of this contract, unless the word 'guarantee' is used in connection therewith, in which case the same shall be express warranties.

\* \* \* \* \* \*

"No modification of this agreement shall be binding unless such modification shall be in writing, accepted by the Purchaser and approved by an officer of the Company."

\* \* \* \* \* \*

3. The Company's liability hereunder shall exist only if the machine is erected, started in operation and tested with the assistance of one of the Company's loaned employees, is erected in conformity with erection instructions, if any, furnished by the Company, has had normal use and service for the purpose for which it was designed, has not been subjected to misuse, negligence or accident and has not been altered or repaired by others than the Company in any respect which in the Company's judgment affects its condition or operation.

4. In the event that the machine does not conform to the provisions of this contract, the Purchaser's *exclusive remedy* shall be as follows: Purchaser may give the Company written notice of non-conformity within ninety (90) days after date of shipment. Within ninety (90) days after the Company shall receive such notice, the Company shall have the opportunity of making the machine conform to the provisions of this contract. If the Company is unable to do so, the Company shall, upon order in writing from the Purchaser, remove the machine as soon as practicable, refund any portion of the purchase price heretofore paid and cancel the Purchaser's obligation to pay the unpaid portion of the price in full satisfaction of the Company's liability hereunder. The Purchaser shall furnish at the Purchaser's expense a means of egress for removal of the machine.

5. The Company shall repair or replace f. o. b. Company's plant any defective parts furnished hereunder upon receipt of notice from the Purchaser within one year from the date of shipment. All labor involved in the removal and/or installation of such parts shall be at the Purchaser's expense.

6. The Company shall not be liable for proximate, incidental, consequential or other damages, including, but not limited to erecting expenses and damages for loss of production or injury to person or property." (Emphasis added.)

The contract of March 23, 1966 contained the same provisions, except that under Conveyors, the following provision was substituted under "A. Carrying Conveyor":

"This conveyor consists of plain steel plates with ⅛" diameter holes on ³⁄₁₆" centers. These conveyor plates have an effective width of 96" and are attached to two runs of plain steel 8" pitch roller chain riding on wear strips fastened to rugged steel track. Each plate has a rugged separate supporting girt and is interlocked with a special piano hinge joint. This conveyor is especially designed with a deflection tolerance of ± ¹⁄₃₂" across each conveyor plate. This deflection is further based on a uniformly distributed load of 30 pounds per sq. ft."

By agreement of the parties, the provisions of this contract are governed by the Uniform Commercial Code as enacted in Purdon's Pennsylvania Statutes Annotated and the cases arising thereunder.

Plaintiff first claims a breach of express warranty. Section 2–313(1)(a)

and (b) of the Uniform Commercial Code provides as follows:

> "Express warranties by the seller are created as follows:
>
> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>
> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description."

There can be no doubt that Section 1 of the General Provisions of the contract is an express warranty against defects in materials and workmanship with regard to all machinery involved in this case. The evidence shows that there was a breach of this warranty with regard to the dryer on Line I, as indicated by the following defects: (1) a left-handed oven instead of a right-handed oven; (2) failure to properly drill holes in the conveyor; (3) failure to level dryer properly; (4) lack of clutch to prevent conveyors from running at different speeds.

The evidence likewise indicates certain defects in the Line II dryer which were a breach of the express warranty given by Proctor. However, all of these defects were remedied by the defendant. In addition to the repairs, all claims for breach of the express warranty were fully settled by the defendant when it paid so-called "back charges" to the plaintiff.

■ The plaintiff also claims that certain descriptions in both contracts amount to express warranties. Certainly descriptions which form the basis of the bargain can be express warranties. However, all such descriptions have been negated as express warranties by Section 1 of the liability clauses, since the word "guarantee" does not appear in the clauses as required by the contracts.

■ Such provisions are permitted under Section 2–316(1) of the Uniform Commercial Code, which provides:

> "Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this Article on parol or extrinsic evidence (Section 2–202) negation or limitation is inoperative to the extent that such construction is unreasonable."

The Official Code Comments provide that:

> "This section is designed principally to deal with those frequent clauses in sales contracts which seek to exclude 'all warranties, express or implied'. It seeks to protect a buyer from unexpected and unbargained language of disclaimer by denying effect to such language when inconsistent with language of express warranty and permitting the exclusion of implied warranties only by conspicuous language or other circumstances which protect the buyer from surprise."

Thus, any description of the equipment, such as the Clause under A.— Carrying Conveyor, which provides:

> "This conveyor is especially designed to hold a tolerance of $\pm$ $\frac{1}{32}$ across the width of the batt, based on a 30 pound per square foot compressive force."

did not give rise to an express warranty. See Anderson, Uniform Commercial Code Second, § 2–316:39, p. 708; Jarnot v. Ford Motor Co., 191 Pa.Super. 422, 156 A.2d 568 (Pa.1959). This interpretation of the contract is fully warranted by the evidence in this case, which clearly shows that, at the time in question, we are dealing with an unproven process. At the time the first Duoform and drying oven were purchased, no one had ever used them in connection with the process which plaintiff contemplated. At the time of the original contract, in June of 1965, it was Steuernagel who thought the P&S dryer could be used

to cure air flote-dry resin pads which are involved in this case.

■ Under these circumstances, it cannot be said that the contract provisions were unexpected by the buyer. In fact, it would have been sheer folly to warrant the performance of the machines. Thus, we do not have a situation in which the contract both gives an express warranty to the buyer and in the next breath takes it away. The provisions of the contract are consistent within the meaning of 2–316(1). Therefore, considering the contract as a whole, there are no express warranties beyond the express warranties against defects in materials and workmanship.

Plaintiff next claims a breach of implied warranty of fitness. Section 2–315 provides:

"Where the seller at the time of contracting has reason to know any particular purposes for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

■■ Whether or not this warranty arises in any individual case is basically a question of fact to be determined by the surrounding circumstances. Of course, under the above section, the buyer need not bring home to the seller the actual knowledge of the particular purpose for which the machine is intended, or his reliance on the seller's skill and judgment, if the circumstances are such that the seller has reason to realize the purpose intended. However, the buyer must actually be relying on the seller. Vacuum Concrete Corp. v. Berlanti Const. Co., 206 Pa.Super. 548, 214 A.2d 729 (1965); Standard Packaging Corp. v. Continental Distilling Corp. (D.C.Pa., 1966), 259 F.Supp. 919; aff. 378 F.2d 505.

Steuernagel admitted that he was familiar with compression drying. He stated that, in the mid-1950's, he read dry-resin fiber process patents which described a compression dryer which had compression and carrying conveyor. He further admitted that these patents gave him the idea to try his air flote-dry resin process.

In 1959, at Lockport Mills, Steuernagel used a German air laying machine and a compression dryer made by Michigan Ovens to develop a dry-resin process. Steuernagel actually helped modify this drying oven. Steuernagel also worked on the amount of residence time of this drying oven. Steuernagel actually worked on ¼″ pads for automative applications. He was familiar with the compression rating of this oven. Steuernagel applied for a patent for improvements of drying ovens. He was familiar with drying ovens used by Gustin-Bacon and Allen Industries which were used to cure pads. Steuernagel also exhibited great familiarity with other types of drying ovens made by Proctor.

Steuernagel also worked for ten years for James Hunter Company, which makes dryers in direct competition with Proctor. He worked on the development of certain types in conveyor dryers. Although he denied working on a compression dryer, Steuernagel was also aware that, throughout the industry, there were numerous problems encountered with drying ovens. For example, he knew there were tracking problems with conveyors. It appears that he made a trip to see a Proctor dryer in operation and was informed of these problems prior to the order of the dryer from Proctor. In 1964, while employed at Allen Industries, Steuernagel installed a dry-resin line including a compression dryer of Allen's design.

Furthermore, Steuernagel admitted that, based on his experience at Lockport, he felt that the 30 pounds per square foot maximum pressure limitation was more than sufficient to compress the batts.

The evidence showed that the dryer involved in this case was essentially a

scaled-up version of a standard 84″ Proctor hold-down conveyor dryer. It is obvious to the court that plaintiff bought the dryer with the hope that it would work. Oral assurances from certain Proctor personnel that they also thought it would work, or that it should work, do not change the fact that this was a high-risk venture in which no one knew what would work and what would not work.

In this case there could be no implied warranty of fitness. William Clapp and Daniel Steuernagel both had extensive experience in the area of manufacturing operations, non-woven products and textiles. It was Simon who demanded that tests be performed at Proctor before any contract was entered into. It was Steuernagel who supervised these tests at Proctor.

Thus, the evidence has established no reliance upon seller but rather that U. S. Fibres and U. S. Equipment relied upon their own judgment and skill in selecting machinery which they concluded would produce their product. The judgment and skill referred to includes Steuernagel's prior knowledge of the Gustin Bacon compression ovens, the Allen Industries compression ovens and the Michigan Oven compression ovens, all of which were utilized in the manufacture of dry, resinated batting. The reason Steuernagel was hired was to evaluate the Proctor machinery. He viewed the Standard Cotton compression oven and selected a similar oven from Proctor from among those which he knew about.

Furthermore, Clause One of the general provisions of both contracts expressly excludes a warranty of fitness. This provision was fully reviewed by plaintiff prior to signing the contracts. This clause is in conformity to the requirements of 2–316 of the Uniform Commercial Code, since it is in writing, conspicuous, and specifically states the word fitness.

Therefore there could be no warranty of fitness on any of the equipment involved in this case.

Plaintiff also claims a breach of implied warranty of merchantability.

Section 2–314 of the Uniform Commercial Code provides:

"(1) Unless excluded or modified (section 2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

"(2) Goods to be merchantable must be at least such as

(a) pass without objection in the trade under the contract description; and

\*　　\*　　\*　　\*　　\*　　\*

(c) are fit for the ordinary purposes for which such goods are used; and

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved;"

Here again Clause One of the general provisions of both contracts expressly excludes any warranty of merchantability.

Section 2–316(2) of the Uniform Commercial Code provides:

"Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.'"

Clause One conforms in all respects to the requirements of 2–316(2). This clause was fully reviewed by plaintiff prior to signing the contract. The

exclusion is in writing, is conspicuous and expressly mentions the word merchantability.

■ Plaintiff urges the Court to strike down certain provisions of the contracts involved in this case because they are unconscionable.

The UCC § 2–302(1) provides:

"If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."

In the light of the facts and commercial background of this transaction, the contract is neither oppressive nor unfair. Both parties realized that its purpose was to allocate the risks associated with this type of transaction. When this is the case, such limitation clauses are enforced, even where one of the parties is in a superior bargaining position. K. & C. Inc. v. Westinghouse Electric Corporation, 437 Pa. 303, 263 A.2d 390 (1970).

■ Plaintiff claims that because of defendant's conduct and oral statements, there was a modification of the original agreement as allowed by UCC § 2–209(1). In this case, there could be no such modification. The parties have expressly provided in their written agreement that all modifications must be in signed writing. This type of provision is clearly allowed under UCC § 2–209(2).

"A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party."

Both parties to this agreement are merchants. There was no written modification. Therefore, the original agreement must stand.

■ In the present case, plaintiff has included in its complaint a count alleging fraud.

To constitute actionable fraud, the plaintiff must prove each of the following elements:

(1) Defendant made a material misrepresentation of fact;

(2) That the misrepresentation was made with the intention that it be relied on; and

(3) Said misrepresentation is, in fact relied upon resulting in damage.

The absence of any one of the above described elements of fraud is fatal to recovery. Dur-ram Packaging v. Self-Seal, 18 Mich.App. 81, 85, 170 N.W.2d 473 (1969); Columbus Pipe and Equipment Company v. Sefansky, 352 Mich. 539, 90 N.W.2d 492 (1958).

■ Fraud can be either actual or constructive. To constitute actual fraud, there must be an intentional deception. On the other hand, constructive fraud does not require intent to deceive. Liability for constructive fraud may be based on a negligent or even innocent misrepresentation. 37 Am.Jur.2d 22, § 4. Aldrich v. Scribner, 154 Mich. 23, 117 N.W. 581; Foster Machine Co. v. Covel Mfg. Co., 219 Mich. 455, 189 N. W. 228 (1922); Irwin v. Carlton, 369 Mich. 92, 119 N.W.2d 617 (1963).

■ It is also well established that each and every element of the fraud must be established by clear and convincing evidence. Youngs v. Advance-Rumley Co., 215 Mich. 682, 689, 184 N. W. 535 (1921); Vargo v. Ihlenfeldt, 359 Mich. 265, 268, 102 N.W.2d 550 (1960).

In support of its claim of fraud, the plaintiff alleges that there were numerous oral representations made by the defendant that the equipment would produce padding of a thickness within a tolerance of $\pm \frac{1}{32}''$. In the alternative, plaintiff claims that defendant knew the dryer would never hold the tolerance of

± ⅟₃₂″ and failed to inform it of this condition.

Plaintiff's fraud claim appears to be based on the following circumstances:

1. Defendant's sales personnel, especially Christiansen, stated that the dryers would produce a dry resinated batt to ⅟₃₂ of an inch tolerance;

2. That, despite the knowledge that plaintiff believed the dryer was guaranteed to produce a product of ⅟₃₂ tolerance, defendant never told plaintiff that the dryer was incapable of so functioning;

3. The letter of March 23, 1966 (Exhibit 53) that there would not be a repetition of fabrication and erection problems on Line II;

4. That plaintiff was induced to stay in business through representations made by Proctor personnel that the dryers would be repaired.

▆▆ Plaintiff bases much of its fraud claim on statements allegedly made by Proctor sales personnel. The assertions made by Proctor are similar to those discussed by the Michigan Supreme Court in Hayes Construction Company v. Silverthorn, 343 Mich. 421, 426, 72 N.W.2d 190, 192 (1955):

"So far as Johnson's assertions as to the merits of the Coleman furnace, that it would do the job, that it was miserly in its consumption of fuel, and the maintenance was nil, we are here in the realm of what the common law has for years termed 'puffing,' a salesman's praise of his own property, involving matter of estimate or judgment upon which reasonable men may differ. Ordinarily these are not regarded as actionable, even though the vendee's joys of realization fall short of those of his anticipation. The reason for this lies in the realities of commercial intercourse. As Judge Learned Hand put it in Vulcan Metals Co. v. Simmons Manufacturing Co., 2 Cir., (CCA), 248 F. 853, 856: 'There are some kinds of talk which no sensible man takes seriously, and if he does he suffers from his credulity. If we were all scrupulously honest it would not be so; but as it is, neither party usually believes what the seller says about his own opinions, and each knows it. Such statements, like claims of campaign managers before election, are rather designed to allay the suspicion which would attend their absence than to be understood as having any relation to objective truth.'"

The evidence in the case establishes the commercial realities of the transaction. The parties negotiated the written contracts governing the purchase at arms length. Representations made during these negotiations were debated by buyer and seller. The buyers were themselves "merchants", and had, in fact, been over the same ground of buying similar machinery in the Lockport Mills transaction.

Another point must be considered as bearing upon the legal conclusion that Proctor did not make any material misrepresentations of fact. The buyer bought machinery to be used as an integral part of a process never before commercially operated. The innovation of introducing the dry resin into the shoddy cotton fiber within the Duoform belonged to Steuernagel and U. S. Fibres. Proctor had in the past been unable to successfully utilize any dry resin system much less a dry resin system with a Duoform, and Steuernagel knew this.

The revolutionary experiment considered in First Acceptance Corp. v. Kennedy, 194 F.2d 819, 820 (1952), is identical to Steuernagel's dry resin concept in that it, too, was a "radical innovation". The Court, in the *First Acceptance* case, found that the seller could necessarily only give his opinion as to the success of a method which was yet untried. The facts in the instant case must result in the same finding.

Since it is acknowledged that Proctor had no prior success with the dry resin system, any representations incident

thereto must only be opinions and not statements of fact.

Plaintiff claims that Exhibits 40, 47 and 48 are circumstantial evidence from which fraud can be inferred. The Court cannot agree.

It appears that these memoranda were written by engineering personnel from Proctor & Schwartz, and were in response to the repeated statements by plaintiff that the dryers were guaranteed to hold a tolerance of $\pm$ 1/32 of an inch across the pad. Thus, these memoranda were precipitated by plaintiff's misconception of the contract, rather than by any scheme by the defendant to defraud plaintiff.

Moreover, the testimony of Clapp clearly shows that U. S. Fibres was aware that a pad with a thickness tolerance of $\pm$ 1/32'' could not be produced. This establishes that there could be no reliance by the plaintiff on any alleged guarantee or promises by the defendant. Steuernagel, who was plaintiff's employee, was an expert in the field. He had installed dryers and even held patents on compression dryers. Thus, there could be no justified reliance on statements concerning the performance of the dryers.

The Court is satisfied that, in fact, no oral misrepresentations of material facts were made by the defendant. Both written contracts clearly show that no guarantee was being made with respect to performance. Plaintiff fully reviewed both contracts. If any oral statements were made by the defendant under the circumstances, they were only expressions of hope that the equipment would perform up to the expectations of the plaintiff.

Finally, plaintiff claims that Exhibit 53 is evidence of fraud. This exhibit is a letter concerning a settlement between the parties and includes a statement that there would not be a repetition of the problems of fabrication and erection of Line I.

The evidence clearly establishes that there were problems in fabrication and erection of Line I.

■ Having independently arrived at the decision to purchase the second dryer, Steuernagel and Clapp naturally wanted assurances that there would not be a repetition in the future of the problems of fabrication and erection that had been encountered in Line I before it began to operate.

■ The rule of law controlling assurances of the nature which were given concerning fabrication and erection is well stated in the early case of Howard v. Reaume, 310 Mich. 119, 126, 16 N.W. 2d 686 (1944), as follows:

"Statements promissory in their character that one will do a particular thing in the future are not misrepresentations, but are contractual in their nature, and do not constitute fraud. Hubbard v. Long, 105 Mich. 442, 63 N.W. 644; Macklem v. Fales, 130 Mich. 66, 89 N.W. 581 . . . 12 R.C.L., p. 254, lays down the rule in the following language:

'Since a fraud must relate to facts then existing or which have previously existed, the general rule is that fraud cannot be predicated upon statements promissory in their nature and relating to future actions, nor upon the mere failure to perform a promise, or an agreement to do something at a future time, or to make good subsequent conditions which have been assured. Nor, it is held, is such nonperformance alone even evidence of fraud. Reasons given for this rule are that a mere promise to perform an act in the future is not, in a legal sense, a representation, and a failure to perform it does not change its character. Moreover, a representation that something will be done in the future, or a promise to do it, from its nature cannot be true or false at the time when it is made. The failure to make it good is merely a

breach of contract, which must be enforced by an action on the contract, if at all.' "

Steuernagel acknowledged that there were no problems with the fabrication and erection of Line II. He testified that Proctor sent out their finest erectors including his own erector. The problems that were encountered in Line II are conceded not to be attributable to improper fabrication and erection.

In view of these considerations, the letter of March 23, 1966, does not form the basis for actionable fraud.

Plaintiff has wholly failed to sustain its burden of proof as to its staying in business in reliance upon the representations of Proctor that it would repair the dryers. The facts clearly support the conclusion that U. S. Fibres, as it was constituted and backed up by the knowledge and facilities of U. S. Equipment, did not rely upon Proctor in connection with repairs beyond that which Proctor could be induced to perform without cost to Fibres.

The chronology of the relationship between the parties is important. The Line I oven began to operate January 20, 1966 after repairs which corrected problems, the nature of which had nothing to do with operations. A settlement was struck covering said repairs and the dryer was accepted as producing a commercially acceptable product.

The first operational problems occurred beginning June 13, 1966. At that time, Steuernagel took pains to represent to Flaith that "the weight of the conveyors alone" is sufficient to produce the Ford Spec product (Exhibit 2). Steuernagel did not point out that the dryer was actually being operated on products having densities much in excess of 4 pounds per cubic foot.

These operational repairs were actually participated in by Fibres and Equipment personnel as was their practice throughout the relationship of the parties because of their own knowledge, experience and expertise with production machinery of all descriptions. The re-pairs were completed and formed the basis of another settlement between buyer and seller. The buyer again accepted the dryer as operational. From the end of July, 1966, Line I was operated until January 19, 1967. Repairs were again performed with the participation of Proctor, U. S. Fibres, and U. S. Equipment personnel. These repairs were performed against the belief that U. S. Fibres was still producing Ford Spec product (Exhibit 2). It has developed in testimony from the President of U. S. Fibres that they never sold a single piece of batting for the application set forth in Exhibit 2. Line I began to operate on February 5, 1967, and continued in operation until the plaintiff's lease expired in June of 1969, 2½ years later. February 5, 1967 marked the last repairs performed on Line I.

Line II was down from January through April, 1967. Thereafter, no further repairs were performed with the exception of the jackknifing of the compression conveyor in December. Line II operated without complaint from April, 1967 through July, 1968, a period of some 15 months.

U. S. Fibres complained about the operation of the dryers on November 27, 1967 (Exhibit 109), but said complaints did not hinder operations (Exhibit 270).

In December of 1967, Proctor told U. S. Fibres in writing that the manufacture of products above 4-pound density was overloading the equipment, and Proctor would consequently only perform repairs if paid. Knowing Proctor's position, plaintiff elected to continue utilizing the machinery. Thus, it made no difference to U. S. Fibres in terms of continuing their operation whether Proctor would repair the dryers or not.

Plaintiff's confidence in its ability to operate and repair the dryers themselves is also borne out by Meldrum's testimony. It established that Simon declined a suggestion by his expert witness to do structural and stress analysis work on

the oven. The suggestion was made in June or July of 1966.

The general test of acts constituting reliance is treated in 12 Mich. Law & Practice, Fraud, § 7, p. 402, as follows:

"In order to recover damages for fraudulent representations, plaintiff must have been deceived and induced by and relied upon such representations. Whether plaintiff would have acted in the absence of the representations is generally the test of whether or not he relied thereon."

Clearly, the act of U. S. Fibres' continuing in business when Proctor stated it would perform no more repairs establishes a total lack of reliance. Thus, the evidence clearly establishes that plaintiff, in fact, did not rely on Proctor to repair the dryers as the reason for staying in business.

The evidence also shows a denial by Johnson of ever having had any telephone conversations with Simon prior to the end of August, 1966. The Court has heard parties of equal interest testifying, one affirming the fraud and the other denying it. As a matter of law, fraud is not proved. Allison v. Ward, 63 Mich. 128, 138, 29 N.W. 528.

There is no doubt that the manufacturer of a product can be held liable for the negligent design and construction of its product. Restatement of Torts 2d, § 299A, p. 73; Spence v. Three Rivers Supply, 353 Mich. 120, 90 N.W.2d 873 (1958).

While many cases dealing with negligent design or construction have involved bodily injuries rather than economic injuries, generally, the same principles can be applied to both types of cases.

A manufacturer must use reasonable care in the design and manufacture of its product. Gossett v. Chrysler Corp., 359 F.2d 84 (6th Cir. 1966). Thus, the standard is not whether the machine could have been made better, but whether the manufacturer has exercised the skill and knowledge normally possessed by members of his trade in good standing in similar communities. Restatement of Torts 2d, § 299A, p. 73; Farr v. Wheeler Mfg. Co., 24 Mich.App. 379, 180 N.W.2d 311 (1970).

There appear to be essentially two areas in which plaintiff claims defendant was negligent. First, plaintiff contends defendant was negligent in not designing a dryer which would produce dry resinated padding in conformity with plaintiff's specifications. Secondly, plaintiff claims defendant did not exercise ordinary skill and competence which any manufacturer normally uses when it produces this type of machinery.

With regard to the first contention, plaintiff claims that, in view of the tests performed at defendant's laboratory, it knew the type, use and thickness of products to be made, and thus, should have designed the dryer accordingly.

The evidence clearly establishes that, at the time of the first contract in 1965, Proctor & Schwartz had absolutely no experience making compression dryers for curing dry resinated fiber pads. This is borne out by the fact that both contracts refer to the top conveyor as a "carrying" conveyor rather than a "compression" conveyor. Moreover, Proctor & Schwartz's attempts to produce dry resinated pads ended in failure, and Steuernagel knew this. It is also clear that, in 1965, neither party knew how much compressive force was actually required to successfully manufacture dry resinated pads, and that Steuernagel felt that a force far less than the maximum of 30 lbs./sq. ft. specified in the contracts was required. From all of the testimony, the Court has concluded that it was plaintiff, through its agents, who thought that a conveyor dryer, as then manufactured by Proctor & Schwartz, would be sufficient to produce the product it desired to make.

As the Court has stated previously, we are dealing with a new process which, at the time of the contract, was not familiar to the defendant. Under such circumstances, defendant cannot be held liable for negligent design of

the dryers insofar as they did not perform up to plaintiff's expectations.

However, there is expert testimony that defendant did not exercise ordinary skill and competence in the basic mechanical and structural design of the dryers. At this point, the testimony stands largely uncontradicted. Defendant contends that the structural failure of the dryer was due to overloading rather than poor design. The Court notes that there is some evidence that the dryers were overloaded. For example: (1) plaintiff talks of the sale of 5 and 6 pound density products. Exhibit 188; and (2) the jute substitute has a specification permitting an 8.3 pound density. Exhibit 88. Because of these considerations, plaintiff's negligence count cannot be dismissed at this point, and this issue can only be resolved by further evidence.

However, even if defendant were liable for breach of warranty or negligence, Section 6 of the contract would bar recovery of consequential damages. That Section provides:

"6. The Company shall not be liable for proximate, incidental, consequential or other damages, including, but not limited to erecting expenses and damages for loss of production or injury to person or property."

Limitations of liability under Pennsylvania law are valid and enforceable. The parties to an agreement may contract as to limitation of liability resulting from breach of both express and implied warranties. Such a limitation may also preclude recovery for losses resulting from negligence. Mayo v. McCloskey & Co., E.D.Pa.1961, 200 F.Supp. 7; Shafer v. Reo Motors, Inc., W.D.Pa. 1952, 108 F.Supp. 659; Charles Lachman Co. v. Hercules Powder Co., E.D. Pa.1948, 79 F.Supp. 206; Eimco Corp. v. Joseph Lombardi & Sons, 193 Pa.Super. 1, 162 A.2d 263 (1960); Magar v. Lifetime, Inc., 187 Pa.Super. 1943, 144 A.2d 747 (1958). See generally National Steel Corp. v. L. G. Wasson Coal Mining Corp., 7 Cir., 1964, 338 F.2d 565;

Fire Ass'n of Philadelphia v. Allis Chalmers Mfg. Co., N.D.Iowa 1955, 129 F. Supp. 335; Southwest Forest Indus., Inc. v. Westinghouse Elec. Corp., 422 F. 2d 1013 (9th Cir. 1970).

While there are no cases in Michigan expressly dealing with the limitation of consequential damages, the Court feels that, under the circumstances of this case, the Michigan Courts would uphold the exclusion of consequential damages. See generally M.C.L.A. § 440.2719; Mattson v. General Motors Corp., 9 Mich.App. 473, 157 N.W.2d 486 (1968).

It is true that under Pennsylvania law, a seller may be held liable for consequential damages even where expressly excluded if it has been guilty of willful and dilatory behavior in not honoring its express warranty. Jones & McKnight Corp. v. Birdsboro Corp., 320 F.Supp. 39 (N.D.Ill.1970); Adams v. J. I. Case Co., 125 Ill.App.2d 388, 261 N.E. 2d 1 (1970). However, the present case does not present any such issue. Defendant made numerous efforts to repair the equipment, and thus made every effort to live up to its warranty obligations.

Moreover, even if there were some legal theory under which plaintiff might recover consequential damages, the evidence to date shows that, as a matter of fact, it has not proven it is entitled to such damages.

The plaintiff attempts to lay full blame on the dryers because they could not deliver commercially acceptable products due to defects in their design. It is admitted, however, that the dryers will only deliver that which is fed into them.

The evidence clearly shows that the Duoform operation and the dry resin process are at least partially the cause of plaintiff being unable to produce a commercially acceptable product. Additionally, and of equal importance, it appears that the plaintiff may have overloaded the equipment by manufacturing products of densities which were greatly in excess of the maximum density prod-

uct for which the machinery was purchased.

These two major factors coupled with a possible lack of maintenance, sabotage by employees, and numerous other contributing factors, ranging from general economic conditions to and including attempted competition against established manufacturers in the industry, make it impossible to determine the proximate cause of plaintiff's damages, if any.

Support in the record for the finding of fact that the Duoform and its operation affected the product is found in the following exhibits:

(1) The sales brochure points out that the last 6 inches at each edge taper off with the last one inch on each side being unsuitable for production. The web coming from the Duoform is itself uneven and barrel shaped. Exhibit 139.

(2) These exhibits establish customer complaints on firmness variation which Steuernagel admits is based solely on the amount of resin present. The plaintiff continued to alter the method of resin application to improve uniformity even into 1969. Exhibits 222, 225, 226, 267 and 278.

(3) The Duoform was subjected to plug-ups which were caused by the resin and the fibers which were utilized in the manufacturing operation. The plaintiff clearly admits that the reason Carpetmate "died" in the marketplace was because of poor quality fiber. Exhibits 236, 284.

The dryer sees only that which is fed to it by the Duoform. The dryer cannot vary the amount or uniformity of fiber or resin present, nor can it alter a lack of uniformity in thickness of the uncured web coming off the Duoform.

There appear to be a number of factors which contributed to the alleged damages:

(1) Expiration of the lease is the reason for ceasing operation. Exhibit 205.

(2) Operations are hindered by a lack of personnel who are qualified. Exhibit 280.

(3) The automobile industry suffered a recession. Exhibit 283.

■ Thus, the evidence to date clearly establishes many possible causes of alleged damages to plaintiff other than the failure of the dryers. The existence of other and equally plausible causes must, as a matter of law, defeat recovery by the plaintiff on each and every count of its complaint.

Finally, the damages which plaintiff seeks were not within the contemplation of the parties at the time of entering into the contract. Keystone Diesel E. Co., Inc. v. Irwin (1963), 411 Pa. 222, 191 A.2d 376. In denying recovery, the Pennsylvania court observed that there were no facts that would put the plaintiff on guard to the fact that the defendant would hold the plaintiff responsible for any loss of profit arising from the inability to use the engine in question.

■ The parties in the instant case gave notice that the only damages which would be contemplated were: (1) the cost of repair or replacement of defective parts for one year, and/or (2) the return of the purchase price on the conditions set forth in the contract. As in Keystone, it would be natural for a malfunction of the equipment sold to cause an interruption in production with resulting damage. However, it is clear in the case at bar that it was within the contemplation of the parties that no damages beyond those set forth in the contract would be allowed in the event of a malfunction.

Thus, the plaintiff's claim for consequential damages must be denied as never being within the contemplation of the parties, as provided in the Uniform Commercial Code.

Thus, if plaintiff does establish negligence, its recovery must be limited to the purchase price of the machinery.

In view of all of these considerations, it is ordered that defendant's motion for an involuntary dismissal be, and hereby is, granted, and Counts I, II, III and IV are dismissed.

It is further ordered that defendant's motion for an involuntary dismissal is denied as to Count V, but that the recovery under this Count, if any, is limited to the actual purchase price of the two dryers involved in this case.